SYLVIA BINDER, AKA SYLVIA KEMPER, SHOOTING STAR, INC., A NEVADA CORPORATION, DBA CLUB SIMONE DE PARIS, CLUB JOY OF PARIS, APPELLANTS, v. LEVY REALTY COMPANY, A NEVADA CORPORATION, RESPONDENT.

No. 18950

April 19, 1990                    790 P.2d 497

*Hamilton & Lynch,* Reno, for Appellants.

*Robert M. Apple,* Las Vegas, for Respondent.

# OPINION

*Per Curiam:*

Sitting without a jury, the district court found there was an oral contract and/or implied contract between appellants and respondent and that respondent was the procuring cause for the sale of three brothels in Winnemucca, Nevada. Accordingly, the district court held that respondent was owed a real estate broker's commission for the sale. On appeal, appellants argue respondent was not the procuring cause of the sale. We agree.

## FACTS

In 1983, appellants, Sylvia Binder and her business associate Jack Thomas (aka Jack Quisler), were attempting to sell three brothels in Winnemucca, Nevada. In early 1983, Thomas met with Victor Vartanian, a real estate agent for respondent Levy Realty Company. Thomas told Vartanian to contact him if Vartanian knew of a potential buyer.

In September of 1983, Vartanian contacted Binder and Thomas to notify them he had potential buyers for the brothels and initially requested they send him a written listing agreement. Vartanian, Binder and Thomas instead agreed to use a written form contract labelled SELLER/BROKER CONTRACT in place of a listing agreement. The contract would list the names of the potential buyers. If these buyers purchased the brothels within a certain time, respondent would receive a seven percent sales

commission. Relying on Binder's and Thomas's word they would send Vartanian a signed contract, Vartanian gave Binder and Thomas the names of the buyers. Shortly thereafter, Vartanian received the contract with the potential buyers' names. Later, these potential buyers lost interest in the sale and did not view the properties or make an offer.

Subsequently, Vartanian registered three new potential buyers. These persons also lost interest and did not view the properties or make an offer.

On October 14 or 15 of 1983, Vartanian was told that John Lowther, an insurance underwriter and investment advisor, might have clients interested in buying the brothels. A phone conversation followed between the two men. The contents of that conversation are disputed.

The district court found that during this conversation, "Vartanian told Lowther that he was a realtor with clients who wanted to sell some brothels." Vartanian states he did not give the names or locations of the brothels in this initial conversation. According to Lowther, Vartanian told him about the properties in Winnemucca and gave him the name "Jack" to call, with a telephone number. After hanging up, Lowther asserts he jokingly told a Paulette Goetz about "buying three cat houses in Winnemucca . . . for tax shelters." Goetz was in Mike Laviant's office, an associate of Lowther's. Lowther insists Goetz and Laviant already knew the brothels were for sale. Each of the brothels was sold to a separate, limited partnership; Goetz was a general partner in all three of the limited partnerships.

On October 28, 1983, Lowther called Vartanian. The contents of that conversation are also disputed. The district court found as follows:

> Lowther called Vartanian and told [Vartanian] of prospective buyers with whom he could meet the next morning. The prospective buyers names were Paulette Goetz and Harold Gewerter. . . . Vartanian contacted Thomas and Binder by phone to register Goetz and Gewerter on the usual, identical Seller/Broker form contract. Vartanian asked that the prospective buyers' names be filled in on the usual form, initialed by Binder and mailed to Levy. Vartanian gave Lowther's phone number to Seller [Binder], called Lowther and gave him Binder's phone number. Vartanian asked to meet Goetz and Gewerter at the morning meeting, but Lowther declined to have Vartanian at the meeting.

Vartanian testified that Lowther called requesting information for a meeting the next day with Goetz and Gewerter. Vartanian maintains this was the first time he heard Goetz's or Gewerter's

names. He then called Binder and Thomas requesting another contract to register Goetz and Gewerter as prospective buyers. Vartanian declares Binder and Thomas told him they would register the names and send back a contract. Vartanian also adds he told Binder and Thomas that Goetz and Gewerter wanted to look at the property in the next day or two. Vartanian states he than called Lowther and said "[Binder and Thomas] approved of my giving them [Goetz and Gewerter] the listing package they requested and also names and telephone numbers that the potential buyers could call for their request to view and inspect the businesses. . . ." Vartanian insists he first gave Binder's and Thomas's names and phone numbers to Lowther in this second phone conversation. Though Vartanian requested to meet with Goetz and Gewerter, Lowther told Vartanian the meeting was personal and it was not necessary that Vartanian attend. At Lowther's request, Vartanian delivered the listing package to Lowther's office before the next day's meeting.

Lowther's account of the October 28, 1983, conversation and related events differs from Vartanian's. His version is as follows: Goetz called him because she had forgotten or could not remember Vartanian's name. She wanted any information about the brothels that Lowther could obtain from Vartanian. Lowther then called Vartanian and asked if Vartanian could send copies of his information on the brothels. Lowther admits he mentioned Goetz's name and some names of others who were possibly interested. Lowther does not remember giving Gewerter's name to Vartanian. Lowther states Vartanian "gave [Lowther] two phone numbers . . . and said that if [Lowther] knew anybody that was interested, to call this guy Jack in Winnemucca." Vartanian then dropped off the brothel information packet at Lowther's office. Lowther does not recall if he merely showed the information to Goetz or gave her a copy. Lowther adds he never discussed a referral fee with Vartanian.

When Goetz and Gewerter went to Winnemucca, they denied they were represented by Vartanian or respondent. As a result, appellants refused to register Goetz and Gewerter as buyers procured by Vartanian. As noted, the brothels were sold to the three limited partnerships with Goetz as a general partner in each.

After the sale, respondent successfully brought suit to recover the seven percent sales commission. This appeal followed.

## DISCUSSION

Appellants argue the district court erred in determining that respondent was the procuring cause of the sale.

This contention has merit. In Nevada, "before a real estate

agent is entitled to a commission, the real estate agent must prove (1) that an employment contract existed and (2) that he or she is the procuring cause of the sale." Morrow v. Barger, 103 Nev. 247, 250, 737 P.2d 1153, 1154 (1987); Shell Oil Company v. Ed Hoppe Realty, Inc., 91 Nev. 576, 580, 540 P.2d 107, 109-110 (1975). Because we hold as a matter of law that respondent was not the procuring cause of the sale, whether an employment contract existed between appellants and respondent is irrelevant.

This court shall not disturb the factual findings of the district court sitting without a jury if those findings are "supported by substantial evidence." Larson v. B.R. Enterprises, 104 Nev. 252, 254, 757 P.2d 354, 356 (1988) (citation omitted). Here, because the factual findings of the district court are supported by substantial evidence, we will not disturb them. However, these particular factual findings do not in turn support the legal conclusion that respondent was the procuring cause of the sale. Accordingly, we reverse the judgment of the district court.

Respondent has not met its burden of proof by showing "conduct that is more than merely trifling." Morrow, 103 Nev. at 253, 737 P.2d at 1156, quoting Schneider v. Biglieri, 94 Nev. 426, 427, 581 P.2d 8, 9 (1978). At trial, it was established that Vartanian never met or spoke to Goetz before the sale. In addition, Vartanian did not show the brothels to Goetz. Furthermore, he was not involved in any of the negotiations for the sale. Finally, though Vartanian testified he dropped off a listing package about the brothels at Lowther's office, he did not withhold this information or insist on his presence at the meeting with Goetz and Gewerter to insure his role as broker for the sale. At best, respondent's conduct, through its agent Vartanian, was a mere introduction of the sellers to the eventual buyer, Goetz. Morrow, 103 Nev. at 253, 737 P.2d at 1156. This introduction only "contribute[d] indirectly or incidentally to the sale." Id. Thus, respondent has not "set in motion a chain of events which, without break in their continuity, cause[d] the buyer and seller to come to terms as the proximate result of his or her peculiar activities." Id. at 253, 737 P.2d at 1157.

For the foregoing reasons, we therefore reverse the judgment of the district court.