JAMES C. PALMER, Appellant, v. DEL
WEBB'S HIGH SIERRA, Respondent.

No. 20338

September 1, 1992                                838 P.2d 435

*Nancyann Leeder,* Nevada Attorney for Injured Workers, Carson City, for Appellant.

*Perry & Spann* and *Douglas R. Rands,* Reno, for Respondent.

*Vargas & Bartlett* and *Albert F. Pagni,* Reno, for Amicus Curiae South Tahoe Gaming Alliance.

*Langton & Kilburn,* Reno; *Hamilton & Lynch,* Reno, for Amicus Curiae Nevada Trial Lawyers Association.

## OPINION

By the Court, Springer, J.:

The issue in this case is whether a worker who claims to suffer from a disease caused by inhaling tobacco smoke exhaled by others in the work place is eligible for compensation under the Nevada Occupational Disease Act (NODA). Appellant Palmer filed a claim for occupational disease compensation, claiming that his lung disease was caused by environmental tobacco smoke present at his place of employment. The trial court, in reversing

an appeals officers' adjudication in favor of Palmer, ruled that "[u]ntil such time as the Legislature so decides, the claim must fail." We agree with the trial court that until the legislature so decides, occupational disease claims based on inhalation of environmental smoke in the work place must fail. Specifically, we agree that environmental smoke, although usually present in a casino, is not uniquely "incidental to the character" of that business. Further, we conclude that secondary smoke is a hazard to which workers, as a class, may be "equally exposed outside of the employment." Therefore, we affirm the judgment of the trial court.

In reading the occupational disease statute one learns that an occupational disease must *arise* out of the employment, that is to say, it must be related to the nature of the employment at hand. The definitional statute, NRS 617.440, requires an occupational disease to be an incident of the employment and not merely an accidental consequence that is not related to the nature of the employment. Specifically, NRS 617.440(1) provides that the disease must be a "natural incident of the work as a result of the exposure occasioned *by the nature of the employment.*" (Our emphasis.)

What this language means is that the disease must arise out of job conditions, specifically, the "nature of the employment." With regard to this requirement, that the disease-causing conditions must be "incidental to the character of the business," it is apparent that the legislature intended that there must be a connection between the *kind* of job and the *kind* of disease. Mere causation is not enough. One could easily say that going to work *caused* a person to develop ulcers; but the "nature of the employment" is, in most cases, not inherently ulcerogenic; and ulcers are not in all probability a "natural incident of the work" claimed to be the cause of the disease. Thus, a person who develops ulcers, catches a cold or gets a migraine headache on the job is probably not going to be able to assert a successful claim for occupational disease compensation.

We are, then, talking about a special kind of cause, "work-related" cause; and where, as appears to be the case here, disease is not related to the *nature* of the job, the disease cannot properly be called "occupational." It is apparent to us that despite its common presence in bars and casinos, environmental tobacco smoke is not incidental to the character of these businesses, is not a *natural* incident of these businesses.

The trial court disallowed Palmer's claim, stating that it "must fail under NRS 617.440(2)." We agree with this conclusion. Under NRS 617.440(2), an occupational "disease must be incidental to the character of the business and not independent of the

relation of the employer and employee." Again, contracting the disease must be part of the actual job. Unless the disease is a part of the job, unless it is "incidental" to the character of the business, a disease cannot be said to have the necessary "direct causal relation" to the employment. NRS 617.440(1)(a). To illustrate: breathing in coal dust is certainly incidental to the character of coal mining work. Whereas coal dust, the cause of "black lung" disease, is certainly incidental to the *character* of coal mining (mining coal necessarily creates coal dust), tobacco smoke is not part of the nature or *character* of a bar or casino business. Tobacco smoke is not a "natural incident" of Palmer's employment nor is exposure to smoke "occasioned by the nature of the employment." NRS 617.440(1)(b). It is probably true that more environmental smoke is associated with the casino and bar businesses than with other businesses; still, the amount and density of such tobacco smoke is highly inconstant and may range from none to quite dense, depending on the particular bar or casino and depending on the air filtration systems and other variables that vary from business to business.

Of course, any individual business establishment might be shown to have an excessive amount of secondary smoke in the work place. Until fairly recently, many office environments were so filled with smoke that they were virtually intolerable to non-smokers. Still, there is nothing in the "nature" of office work that would make stale tobacco smoke a "natural incident of the work." A nonsmoker unfortunate enough to contract some disease because of the excessive smoke rather clearly would not be entitled to compensation, because "environmental smoke disease" is not an occupational disease of office work. The legislature, of course, is free to declare that any person who contracts some secondary smoke-related disease at work is eligible for occupational disease compensation. The courts, we believe, do not have this power.

What we must not lose sight of is the reality that occupational disease coverage is designed to protect those who suffer illness because of the special nature of their *occupation,* those who suffer from an *occupational* disease. That is why words like "natural incident" of the employment and "occasioned by the *nature* of the employment" are used in NRS 617.440. In NRS 617.450, the statutory schedule of occupational diseases, we find further indication of the legislature's intention that occupational diseases be incidental to the character of the business and occasioned by the nature of the employment. The diseases listed in the statute are quite job-specific and are closely related to the nature of the particular occupation, diseases such as "brass and zinc poisoning" or "chrome ulceration of the skin or nasal passages."

In addition, NRS 617.450 provides a description of the specific processes by which the listed diseases are contracted. The statutory purpose is clearly to provide protection for people who have diseases that are related to their particular jobs. If the disease is not related to the character of the particular business and not proximately caused by the "conditions under which the work is performed," it is not an occupational disease.[1]

Smith v. Garside, 76 Nev. 377, 355 P.2d 849 (1960), is in harmony with our opinion in this case. In *Smith,* a woman working in a printing plant claimed that she had incurred serious diseases as a result of her employer's failure to heat the work place adequately. We concluded that a disease contracted under such circumstances was not "occupational" because the disease, which resulted from a poorly heated place of employment, was not, as required under NRS 617.440 "incidental to the character of the business." *Id.* at 382, 355 P.2d at 352. In *Smith* we also concluded that Smith's disease was not "occupational" because NRS 617.440 excludes from coverage any disease that "come[s] from a hazard to which workmen would have been equally exposed outside of the employment."

As the condition of poorly heated premises is common and not "incidental to the character" of the printing business, so is secondary tobacco smoke a condition that is not incidental to the "character" or "nature" of the casino business. Similarly, as the condition of poorly heated premises is one to which workers are commonly exposed outside of employment, so is secondary tobacco smoke a condition to which we are generally exposed independent of our employment.

Based on the statutory provisions and on our case law, we hold as a matter of law that diseases claimed to be caused by environmental tobacco smoke present in the work place are not covered by the Nevada Occupational Disease Act. We therefore affirm the judgment of the trial court.

ROSE, J., and WHITEHEAD, D. J.,[2] concur.

---

[1] The concurring justice contends that Desert Inn Casino & Hotel v. Moran, 106 Nev. 334, 792 P.2d 400 (1990), is in "direct conflict" with this opinion. The concurring opinion, however, fails to recognize that Moran's aggravated joint disease was compensable as an occupational disease because it was specifically related to Moran's job *as a masseuse* and was a direct result of the *character* of the massage business which the casino ran. If Moran had been exposed to second-hand smoke while working as a masseuse, any lung disease would not have been compensable, as exposure to smoke was not incidental to Moran's job as a masseuse.

[2] The Honorable Jerry Carr Whitehead, District Judge of the Second Judicial District, was designated by the Governor to sit in place of THE HONORABLE JOHN MOWBRAY, Chief Justice. Nev. Const. art. 6, § 4.

YOUNG, J., concurring:

I concur with the majority's result but cannot agree with its reasoning. I therefore write separately.

The issue presented by this appeal is whether a lung disease caused by secondhand tobacco smoke is covered by NODA.[1] To resolve this issue, however, this court must decide whether compensable occupational diseases are restricted to those specifically listed in NODA.

### Facts

For over twenty years, Palmer was employed at Del Webb's High Sierra Casino ("High Sierra") as a "pit boss." His job required that he supervise gaming tables from an area in the casino referred to as the "pit." The pit area had noticeably high levels of secondhand tobacco smoke. During most of Palmer's years at High Sierra, the casino encouraged smoking by providing free cigarettes and numerous ashtrays. When High Sierra ended this policy, it still provided cigarettes to its preferred customers.

In Spring 1988, at the age of fifty-eight, Palmer experienced coughing and breathing problems. He curtailed his outdoor activities but continued working until August 1, 1988, when, following doctors' orders, he took a medical leave of absence. Although Palmer was not a smoker, several doctors diagnosed him as suffering from reactive airways disease, severe bronchitis and asthma. They concluded that Palmer's condition was caused by, or substantially aggravated by, the smoke-filled environment at High Sierra. His doctors ordered that he not return to work unless he could do so in a smoke-free environment.

Palmer filed a request for workmen's compensation with High Sierra, claiming that he suffered from chronic obstructive pulmonary disease caused by the secondhand tobacco smoke at work. High Sierra rejected Palmer's claim, so he requested a hearing with the administrative hearings officer. At the hearing, Palmer

---

[1] Nonsmokers' exposure to tobacco smoke is known by several terms, including secondhand tobacco smoke, environmental tobacco smoke, involuntary smoking and passive smoking. U.S. Environmental Protection Agency, *Indoor Air Facts No. 5, Environmental Tobacco Smoke* 1 (1989). For purposes of this concurring opinion, I will use the term "secondhand tobacco smoke."

Secondhand tobacco smoke is a combination of the smoke exhaled by a smoker (mainstream smoke) and the smoke emitted from the burning tobacco (sidestream smoke). U.S. Dept. of Health and Human Services, *The Health Consequences of Involuntary Smoking, A Report of the Surgeon General* 7 (1986). The majority appears to focus its attention primarily on mainstream smoke. Palmer's claim, however, seeks compensation for lung disease caused by secondhand tobacco smoke, not merely mainstream smoke.

presented evidence from three medical doctors who stated Palmer's condition resulted from continuous exposure to toxic tobacco fumes contained in the secondhand tobacco smoke. Another doctor stated that Palmer suffered from severe asthma and that the exposure to the smokey environment placed him at great danger.

The hearings officer found that it was "uncontested that Palmer's work exposure to cigarette smoke caused his chronic obstructive lung disease." The hearings officer, however, affirmed the denial of compensation. He concluded that Palmer did not suffer a compensable occupational disease because lung diseases, under NRS 617.455, were restricted to firemen and police officers.

Palmer appealed and presented uncontroverted evidence to the appeals officer. Palmer was not a smoker, nor did he socialize or live with smokers.[2] Palmer exercised regularly, jogging every other day. Outside of work, he spent most of his time participating in outdoor activities, such as water and snow skiing, fishing, windsurfing and biking.

The appeals officer reversed the decision of the hearings officer, finding:

> The evidence presented by testimony and by documents establish[es] a direct causal connection between Palmer's work in an enclosed area containing smoke in the air he breathed and his occupational disease of chronic pulmonary dysfunction. Because Palmer was required to be in the pit area in order to perform his job for High Sierra and because he was exposed in that area to smoking by gaming patrons, *his chronic pulmonary disorder was occasioned by the nature of his employment.* His employment is the proximate cause of his occupational disease since *he was not exposed to [secondhand tobacco] smoke in his normal life on a habitual basis. His job conditions exposed him to the hazard of [secondhand tobacco] smoke in a greater amount than other workers. His chronic pulmonary disorder is incidental to the character of being a pit boss* in a gaming establishment since he was required to be in a smokey area in order to perform his job duties.

(Emphasis added.)[3] The appeals officer concluded that Palmer

---

[2]Two long-time acquaintances of Palmer testified that they had never known Palmer to smoke or associate with smokers.

[3]The appeals officer further stated: "Mr. Palmer has done an extraordinarily good job of establishing that exposure in the work place was far far greater than any he could have possibly been exposed to outside of work." Moreover, the appeals officer concluded that the disease was incidental to the character of the business because there was no element of volitional control, as Palmer could not control his exposure to the secondhand tobacco smoke.

suffered a compensable occupational disease under NRS 617.440. However, the district court reversed the decision of the appeals officer, summarily concluding that the disease was not incidental to the character of the business.

## Discussion

### I. Compensable occupational diseases are restricted to those statutorily listed.

By applying NRS 617.440 as a catch-all provision, the majority assumes that compensable occupational diseases are not restricted to those statutorily listed. In so doing, the majority unfortunately broadens the coverage under NODA in spite of the legislature's clear language and intent to restrict compensable occupational diseases to those listed. A careful review of NODA demonstrates that the majority's application of the statute has the potential of inflicting serious (and perhaps devastating) financial burdens on SIIS.

#### A. The plain language of NODA restricts coverage to those diseases listed.

Pursuant to NODA, an "employee who is disabled or dies because of an occupational disease, *as defined in this chapter, arising out of and in the course of* employment in the State of Nevada . . . [is] entitled to the compensation provided by chapter 616 . . . ." NRS 617.430(1) (emphasis added).

Determination of coverage under NODA generally constitutes a two-step analysis. First, the employee must be seeking compensation for one of the occupational diseases "defined" in NRS Chapter 617. Second, the employee must show the requisite causation—that is, the injury claimed as a result of an occupational disease must "arise out of and in the course of" the employment as set forth in NRS 617.440.[4]

NODA contains a schedule of twenty-two diseases in NRS 617.450. That section provides in part:

> The following diseases, as well as other occupational diseases defined in NRS 617.440, shall be considered occupational diseases and shall be compensable as such *when contracted by an employee and when arising out of and in the course of the employment in any process described in this section.*

---

[4]Cancer as an occupational disease of firemen (NRS 617.453), lung diseases as occupational diseases of firemen and police officers (NRS 617.455), and heart diseases as occupational diseases of firemen and police officers (NRS 617.457) involve a different causation analysis. Those sections begin with the introductory phrase "Notwithstanding any other provision of this chapter" and thereafter specify the requisite causation.

NRS 617.450 (emphasis added). While NRS 617.450 refers to "other occupational diseases defined in NRS 617.440," nowhere in NRS 617.440 is the phrase "occupational diseases" expressly defined. Instead, NRS 617.440 provides:

1. An occupational disease *defined in this chapter* shall be deemed to arise out of and in the course of the employment if:

(a) There is a direct causal connection between the conditions under which the work is performed and the occupational disease;

(b) It can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;

(c) It can be fairly traced to the employment as the proximate cause; and

(d) It does not come from a hazard to which workmen would have been equally exposed outside of the employment.

2. The disease must be incidental to the character of the business and not independent of the relation of the employer and employee.

3. The disease need not have been foreseen or expected, but after its contraction must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a natural consequence.

4. In cases of disability resulting from radium poisoning or exposure to radioactive properties or substances, or to roentgen rays (X-rays) or ionizing radiation, the poisoning or illness resulting in disability must have been contracted in the State of Nevada.

(Emphasis added.) This section clearly addresses only the causation element required for a claimant to recover for a compensable occupational disease. NRS 617.440 is not a catch-all section, as the majority implies, for the judiciary to expand by judicial fiat the number of covered occupational diseases. The legislature could have easily provided that an occupational disease "means," "is" or "is defined as" any disease which "arises out of and in the course of the employment." Instead, NRS 617.440 provides the elements necessary for a disease, which has already been *defined* as occupational, to arise out of and in the course of the employment.[5]

---

[5]In only one case has this court affirmed a finding that an occupational disease is not restricted to those diseases expressly listed in the statute. *See* Desert Inn Casino & Hotel v. Moran, 106 Nev. 334, 792 P.2d 400 (1990)

B.   *The legislative intent endorses interpreting NODA as restricted to those diseases statutorily listed.*

Assuming, arguendo, that the reference in NRS 617.450 to "other occupational diseases defined in NRS 617.440" is ambiguous, this court must then ascertain—guided by reason and public policy—what the legislature intended by such language. Sheriff v. Marcum, 105 Nev. 824, 826, 783 P.2d 1389, 1390 (1989), *amended* 790 P.2d 497 (1990); State v. Vezeris, 102 Nev. 232, 236, 720 P.2d 1208, 1211 (1986). Legislative intent is determined by an examination of the whole act, its object and its scope. Nevada Power Co. v. Public Serv. Comm'n, 102 Nev. 1, 4, 711 P.2d 867, 869 (1986). As Justice Learned Hand said in Guiseppi v. Walling, 144 F.2d 608, 624 (2d. Cir. 1944), this court must "put [itself] in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation."

1.   *The legislative history sets the restrictive foundation.*

Traditionally, the workmen's compensation laws did not expressly cover occupational diseases. Peter S. Barth and H. Allen Hunt, *Workmen's Compensation and Work-Related Illnesses and Diseases* 92 (1980). The earliest type of occupational disease found coverage under the definition of "injury" or "disease" of the workmen's compensation acts. Arthur Larson, *Workmen's Compensation Law,* § 41.20 (1991).

In 1906, England enacted a schedule-type act which specifically listed the diseases along with the process by which they were acquired. Barth et al., *supra,* at 93. In the 1920's, following England's lead, the states began adopting schedule-type occupational disease acts. *Id.* at 99; Larson, *supra.* The limiting attribute of these schedule-type acts attracted the states; the states were concerned with overburdening the system—a foreseeable consequence of a heavy incidence of certain diseases in particular industries. Larson, *supra,* § 41.20.

On March 15, 1947, the Nevada Legislature enacted a schedule of compensable occupational diseases. NRS 617.440 comes from legislation approved on that date. Act of March 15, 1947, ch. 44, 1947 Nev. Stat. 61. The legislature obviously intended to restrict coverage when it provided: "Only the following diseases shall be considered occupational diseases and compensable as such, when contracted by an employee arising out of and in the

(masseuse developed degenerative joint disease in her hands). In my opinion, *Moran* failed to properly analyze NODA and was incorrectly decided. Therefore, I would overrule *Moran* to the extent it is inconsistent with this concurring opinion.

course of the employment in any process described herein.'' 1947 Nev. Stat. ch. 44, § 26(b). This language was followed by a schedule describing twenty-three diseases or injuries and the processes involved in their contraction.

Subsequent amendments followed this theme of restricted coverage. The 1947 act was amended in 1949, providing in part:

> The following diseases as defined as well as all other occupational diseases defined in subdivision (a) of this section shall be considered occupational diseases and shall be compensable as such, when contracted by an employee *and when arising out of and in the course of the employment in any process described herein.*

1949 Nev. Stat. ch. 177, § 5 (emphasis added). This language is now contained in NRS 617.450 followed by twenty-two occupational diseases and their processes. The 1949 amendment added the language which, arguably, creates the ambiguity existing in the present statute. However, when read in connection with the remaining language of that section, it is apparent that the legislature did *not* create a catch-all provision. The occupational diseases defined in subdivision (a) (NRS 617.440) were compensable when, and only when, they ''ar[ose] out of and in the course of the employment *in any process described herein.*'' 1949 Nev. Stat. ch. 177, § 5 (emphasis added).

## 2. *The legislature extends coverage beyond those in the schedule by amending NODA and specifically listing the new disease.*

Recent amendments further demonstrate that the legislature intended to limit compensable occupational diseases to those expressly listed in the statute. NODA was amended in 1965 such that lung diseases of firemen and police officers were compensable; and in 1987, the legislature added cancer for firemen.[6] If the

---

[6]Palmer argues that the 1965 amendment to NODA which added industrial coverage for firemen and police officers somehow demonstrates a legislative intent to cover his claim. Palmer argues that coverage for lung diseases was *not* expanded by NRS 617.455 but that it *merely* provides a conclusive presumption. This amendment stated that lung diseases resulting from exposure to heat, smoke, fumes, tear gas or any other noxious gases would be covered if the fireman or police officer had been employed for two or more years. In addition, it stated that for a fireman or police officer employed continuously for five years or more, there is a conclusive presumption that the disease arose in the course of employment.

If a conclusive presumption for those with five or more years of employment was the *only* purpose for the amendment because coverage *already* existed, there was manifestly no reason to specify that claimants with more than two years, but less than five years, *would thereafter* be covered or that

1949 act opened the door to all "occupational diseases" arising out of and in the course of employment, these subsequent acts were clearly unnecessary.

Moreover, the original schedule of occupational diseases included silicosis. *See* 1947 Nev. Stat. ch. 44, § 26(b). By March 1957, the legislature had deleted silicosis from the list of twenty-three occupational diseases and set it out in a separate section: "Silicosis [is an] occupational disease and [is] compensable as such when contracted by an employee and when arising out of and in the course of the employment." *See e.g.,* 1957 Nev. Stat. ch. 219, § 1 (codified as NRS 617.460(1)). If NRS 617.440 was a catch-all provision, the legislature did not have to list silicosis in a separate section. Rather, it could have merely deleted silicosis from the list of twenty-three "occupational diseases," and a claimant would thereafter be able to recover pursuant to NRS 617.440.[7]

### 3. *NODA is not consonant with any of the catch-all provisions from sister states.*

The majority has erroneously grouped NODA into the type of statutes enacted by sister states which contain both a schedule of compensable diseases and an actual catch-all provision. *See generally* Larson, *supra,* appendix A, table 2A (state-by-state compilation of selected occupational diseases). Each of these statutes, however, is distinguishable from NODA. Several statutes expressly provide that compensable occupational diseases are not limited to those in the schedule. For example, Idaho's statute expressly provides: "Recognizing that additional toxic or harmful substances or matter are continually being discovered and used or misused, the above enumerated occupational diseases [the scheduled diseases] are not to be taken as exclusive . . . ." Idaho Code § 72-438 (Supp. 1991). Likewise, Ohio's statute provides: "A disease which meets the definition of an occupational disease is compensable pursuant to Chapter 4123 of the

---

claims related to "heat, smoke, fumes, tear gas, or other noxious gases" would thereafter be covered. Therefore, if this expanded coverage had not been specified by the 1965 legislature, it would *not* exist.

[7]Likewise, in 1991, the legislature expanded the definitions of industrial "injury" to include exposure to a contagious disease while providing medical services. 1991 Nev. Stat. ch. 723, § 43. Specifically, NRS 616.110(3) provides:

> For purposes of this chapter, the exposure of an employee to a contagious disease while providing medical services, including emergency medical care, in the course and scope of his employment shall be deemed to be an injury by accident sustained by the employee arising out of and in the course of his employment.

Revised Code *though it is not specifically listed in this section.*" Ohio Rev. Code Ann. § 4123.68 (Anderson 1990) (emphasis added).

Other statutes list a catch-all provision within the schedule of compensable diseases. To illustrate, North Carolina's statute reads, in part:

> The following diseases and conditions only shall be deemed to be occupational diseases within the meaning of this Article:
>
> (1) Anthrax.
>
> (2) Arsenic poisoning.
>
> (3) Brass poisoning.
>
> . . . .
>
> (13) Any disease, other than hearing loss covered in another subdivision of this section, which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment.

N.C. Gen. Stat. § 97-53 (1989); *see also* Ga. Code Ann. § 34-9-280(3)(F) (1990); Utah Code Ann. § 35-2-27(28) (1988); Pa. Stat. Ann. tit. 77 § 1208(n) (1991).

The remaining statutes expressly define "occupational disease" as a disease in catch-all language. *See* N.Y. Work. Comp. Law § 2(15) (McKinney Supp. 1992) (occupational disease defined as "a disease resulting from the nature of employment and contracted therein"); R.I. Gen. Laws § 28-34-1(3) (1986) (occupational disease means "a disease which is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process or employment"); Utah Code Ann. § 35-2-107 (Supp. 1991) (a compensable occupational disease "is defined as any disease or illness which arises out of and in the course of employment").

I respectfully submit that NODA does not expand the scope of compensable diseases beyond those listed in the schedule by any of the methods described above. There is no savings clause for additional diseases, no catch-all provision listed within the schedule, nor is "occupational disease" defined as one which arises out of and in the course of the employment. Instead, NODA provides that an employee may recover for damages which result from a *defined* occupational disease which "arises out of and in the course of the employment."

## 4. *Public policy directs that NODA be interpreted such that compensable occupational diseases are restricted to those listed.*

Lastly, I believe that the public policy of this state will be furthered by resolving the ambiguity, if any, in favor of the legislature's restrictive intent. The legislature has specifically mandated that SIIS be "actuarially funded" and "regularly review[ed] by the legislative and executive departments." NRS 616.1701. While there is no data to show the actual impact the majority's decision will have on the system, simple mathematics can demonstrate the possible implications.

In our casino and hotel industries alone, it is estimated that there are slightly over 100,000 employees who, like Palmer, have been or are now being exposed in some degree to secondhand tobacco smoke. *See generally* Nevada Employment Security Department, *Nevada Occupational Projections, 1987-93* (August 1989). A hypothetical worker receiving the same salary as Palmer would receive maximum benefits of approximately $20,000 annually. If the hypothetical worker remained permanently and totally disabled, he would receive not only this pension but medical expenses as well. Thus if he lived for another thirty years, he would receive approximately $600,000 from the system, plus medical expenses (not counting any cost of living increases that might be given).

Base on the majority's catch-all interpretation, the additional burden these new claims could have must be viewed in regard to the current system. Claims increased sixty-two percent during the period of 1983-92, and, in the same time period, claims expenses increased 400 percent to almost $432,000,000.[8] Mike Norris, *Reforms Key to SIIS Future,* Reno Gazette-Journal, June 19, 1992, at 1B. In light of these increases, it is not surprising that SIIS is presently in financial straits. During fiscal year 1991-92, SIIS did not generate sufficient income to cover the incurred expenses, and, consequently, the book value of SIIS' portfolio was substantially depleted. State Industrial Insurance System, *Cash Flow Forecast, Information Packet* 1 (March 17, 1992). The 1992 fiscal year will end with an approximate $92,000,000 deficit. Norris, *supra.* In order to cover this loss, SIIS will dip into its reserve. *Id.* Thus, in March 1992, SIIS projected that absent a twenty-two percent rate increase, its portfolio would be

---

[8]A 1972 report indicated that, nationally, at least 390,000 new occupational diseases were compensated annually. Note, *Compensating Victims of Occupational Disease,* 93 Harvard Law Rev. 916 (1980) (citing *The President's Report on Occupational Safety and Health III* (1972)).

completely depleted during the first part of fiscal year 1996. *Id.* at 11. These figures have added significance in this case where, according to SIIS, occupational disease claims represented less than one percent of the total claims accepted by SIIS during each of the past five fiscal years.

Public opinion of the proposed but withdrawn twenty-two percent rate increase prompted Nevada businesses to question whether SIIS is the appropriate avenue for ensuring compensation for injured workers. *See, e.g.,* Mike Kirkpatrick, *Give People a Choice,* Reno Gazette-Journal, April 10, 1992, at 12A. In June 1992, SIIS proposed a reform plan which included a 9.2 percent increase in employer premiums and the following requirements: that claimants be required to select doctors from a prescribed list; that claims examinations be closely scrutinized; and that vocational rehabilitation regulations be clarified. Norris, *supra.*

Notwithstanding the potentially crushing impact on a financially floundering system, the majority is improvidently creating a breeding ground for modern occupational diseases by transforming NRS 617.440 into a catch-all provision. The majority is unnecessarily encumbering SIIS with new unforeseen claims and, conceivably, a devastating impact. Sound policy mandates that this court should not further burden SIIS where the legislature has not so directed.

## II. *Palmer demonstrated that his disease "arose out of and in the course of" his employment.*

If, however, I accepted the majority's position that NRS 617.440 is a catch-all provision, I would hold that Palmer asserted a compensable occupational disease. I disagree with the two broad conclusions used by the majority to preclude Palmer's claim. The majority argues: (1) that secondhand tobacco smoke is not incidental to the character of casinos, and (2) that exposure to secondhand tobacco smoke is a hazard to which workers, as a class, are equally exposed outside of employment.

### A. *Standards of review and construction of workmen's compensations claims support Palmer's claim.*

In reviewing administrative decisions, this court will not reverse if there is substantial evidence to support the decision. SIIS v. Christensen, 106 Nev. 85, 87-88, 787 P.2d 408, 409-10 (1990); SIIS v. Swinney, 103 Nev. 17, 20, 731 P.2d 359, 361 (1987).[9] Substantial evidence is evidence which a "reasonable

---

[9]This standard of review is mandated by NRS 233B.135(3), which provides:

The court shall not substitute its judgment for that of the agency as to

mind might accept as adequate to support a conclusion." State of Nevada Employment Security Depart. v. Hilton Hotels Corp., 102 Nev. 606, 607-08, 729 P.2d 497, 498 (1986) (citing Richardson v. Perales, 402 U.S. 389 (1971)).

The above standard must be viewed in light of this court's long-standing policy of liberally construing the workmen's compensation statute to provide coverage. These statutes were enacted as a humanitarian means of compensating injured workers. Industrial Commission v. Peck, 69 Nev. 1, 10-11, 239 P.2d 244, 248 (1952). Thus, "[a] reasonable, liberal and practical construction of workman's compensation statutes is preferable to a narrow one where these statutes are enacted for the purpose of giving compensation, not denying it." SIIS v. Woodall, 106 Nev. 653, 658, 799 P.2d 552, 555 (1990); see also, Desert Inn Casino & Hotel v. Moran, 106 Nev. 334, 337, 792 P.2d 400, 402 (1990); Weamer v. SIIS, 104 Nev. 305, 306, 756 P.2d 1195, 1196 (1988); SIIS v. Buckley, 100 Nev. 376, 381, 682 P.2d 1387, 1390 (1984); Hansen v. Harrah's, 100 Nev. 60, 63, 675 P.2d 394, 396 (1984).

### B. *Secondhand tobacco smoke is incidental to Palmer's employment.*

Whether an employee has suffered a compensable occupational disease arising out of his employment is a question of fact. General Cas. Co. of Wisconsin v. Labor and Industry Review Comm'n, 477 N.W.2d 322, 324 (Wis.Ct.App. 1991); see also Shelby Mutual Ins. Co. v. Department of Indus., Labor and Human Relations, 327 N.W.2d 178, 180 (Wis.Ct.App. 1982) ("The question of the existence of an occupational disease is one of fact rather than law."). Similarly, whether an occupational disease is "characteristic of the employment and caused peculiar to the employment" is a factual determination Ross Lab. v. Barbour, 412 S.E.2d 205, 208-09 (Va.Ct.App. 1991).

Palmer presented uncontroverted evidence to the appeals officer that his disease was caused by the secondhand tobacco smoke at his place of employment. Palmer was forced to work in this polluted environment in order to perform his duties. High Sierra even facilitated such an environment and encouraged smoking by

---

the weight of evidence on a question of fact. The court may remand or affirm the final decision or set it aside in whole or in part if substantial rights of the petitioner have been prejudiced because the final decision of the agency is:

. . . .

(e) Clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; or

(f) Arbitrary or capricious or characterized by abuse of discretion.

dispersing free cigarettes to its patrons. As recognized by casino officials, "smoking goes hand-in-hand with gaming." Wayne Melton, *More Hotel-Casinos Cater to Non-Smokers,* Reno Gazette-Journal, April 20, 1992 (quoting Emelie Melton, John Ascuaga's Nugget Hotel-Casino publicist in Sparks).

Accordingly, the appeals officer found that Palmer's "chronic pulmonary disorder is incidental to the character of being a pit boss in a gaming establishment since he was required to be in a smokey area in order to perform his job duties." Assuming that NRS 617.440 is a catch-all provision, this court must affirm the appeals officer's finding because there was substantial evidence to support such a finding. *Christensen,* 106 Nev. at 87-88, 787 P.2d at 409-10.

Nonetheless, the majority concludes that Palmer's disease is not incidental to the character of casinos. Based on the uncontroverted facts of this case, the appeals officer's findings of fact, the deference which this court accords administrative findings of fact, and our policy toward liberal construction of the workmen's compensation laws, I disagree.

I also reject the majority's construction of the "incidental" requirements set forth in NRS 617.440. The rule pronounced by the majority (as suggested in its "black lung" disease hypothetical) is that while the worker performs his duties in furtherance of the business' product, his actions necessarily create the disease-causing agent; consequently, the disease cannot arise from *conditions coincidentally occurring* in the claimant's workplace. As explained by the majority, "the cause of 'black lung' disease, is certainly incidental to the *character* of coal mining (mining coal necessarily creates coal dust)." Under this reasoning, the presence of cigarette smoke in the casino is apparently not a product of High Sierra's line of business, which is providing gambling entertainment. Therefore, concludes the majority, Palmer's disease is not compensable. My colleagues give several supporting reasons: (1) depending on the particular casino, the amount and density of secondhand tobacco smoke is highly inconstant and may range from none to quite dense; (2) the purpose of occupational disease coverage is to protect those who suffer illness because of the special nature of their occupation; and (3) Nevada case law is in harmony with this case.

I venture the suggestion that these reasons fail to support the majority's conclusions. First, it is irrelevant whether the amount of secondhand tobacco smoke varies depending on the particular casino: this case involves only Palmer's work environment at High Sierra. Here, the fact-finder determined that High Sierra had high levels of secondhand tobacco smoke, especially in the pit where Palmer worked.

Second, without citing authority, the majority asserts that the purpose of compensating an employee who suffers from an occupational disease is "to protect those who suffer illness because of the special nature of their *occupation.*" The majority reasons that this is why the phrases "natural incident" and "occasioned by the nature of the employment" are used in NRS 617.440.

Actually, the purpose of NODA is to provide coverage for specified occupational diseases and to terminate private litigation between the employer and its employee through no-fault compensation. Pershing Quicksilver Co. v. Thiers, 62 Nev. 382, 389, 152 P.2d 432, 436 (1944). However, as Larson notes, awards for occupational diseases initially did not flourish because "diseases" did not fit within the idea of substituting no-fault liability for those "injuries" which were considered the subject of fault liability:

> [W]hile accidental injuries were known to the common law and could be made the subject of an action for damages in appropriate circumstances, the concept of occupational disease was a stranger to the lexicon of the precompensation-era common law. To the extent that compensation acts were thought of as substituting nonfault liability for the kind of injuries that were potential subjects of fault liability, there was thought to be no place for occupational diseases, which (in the sense of a disease due to the "normal" conditions of the industry as distinguished from the negligence of the employer) had consistently been held incapable of supporting a common-law action.

Larson, *supra,* § 41.20.[10]

Thus, compensation acts defined occupational diseases such that diseases which could be contracted in every day life were excluded from coverage. Larson, *supra,* § 41.33. Through the language cited by the majority, as well as the other criteria set forth in NRS 617.440, NODA likewise differentiates between occupational diseases and those contracted in every day life. There are two conditions of employment which make this distinction: the employment involves unusual chemicals, dusts, poisons or germs; or the employment involves familiar harmful elements which are present in an unusual degree. Larson, *supra,* § 41.33(b).

In fact, normal activities such as walking on hard surfaces for many years have been grounds for a compensable disease.

---

[10]States were also uncertain as to whether occupational diseases could be more properly dealt with under general health insurance legislation. Larson, *supra,* § 41.20. Additionally, states did not want to place too much burden on the system. *Id.*

Wildermuth v. B.P.O. Elks Club (Lodge 621), 170 N.Y.S.2d 874, 874 (N.Y.App.Div. 1958). In *Wildermuth,* a waiter worked on his feet, eight to nine hours per day, for twenty-five years; as a result, he developed varicose veins in one leg. *Id.* The court stated:

> Appellants seem to contend that because the condition could occur to any one who is on his feet a great deal it was not an incident of claimant's occupation. However, "The conditions of employment which distinguish the occupational disease from the ordinary diseases of life" are sufficiently distinctive if "familiar harmful elements are present in excessive degree."

*Id.* (citations omitted). Likewise, the Missouri Court of Appeals recognized that an occupational disease can be identified through high exposure to familiar elements:

> [T]he determinative inquiry, here, as to the "special quality" of the employment, involves two considerations: 1) whether there was an exposure to the disease—carpal tunnel syndrome—which was greater than or different from that which affects the public generally, and 2) whether there was a recognizable link between the disease and some distinctive feature of the claimant's job which is common to all jobs of that sort.

Jackson v. Risby Pallet and Lumber Co., 736 S.W.2d 575, 578 (Mo.Ct.App. 1987).

Moreover, when this court construes a statute, words will be given their ordinary meaning if possible. Dumaine v. State, 103 Nev. 121, 125, 734 P.2d 1230, 1233 (1987). NRS 617.440(2) requires that the disease "must be incidental to the character of the business and not independent of the relation of the employer and employee." "Incidental" is defined as "[o]ccurring or liable to occur in fortuitous or subordinate conjunction with something else of which it forms no essential part." Oxford University Press, *Oxford English Dictionary, The Compact Edition* 1401 (500th Anniv. Ed. 1971).[11] Palmer's disease definitely occurred in "subordinate conjunction" with "the character of the business." Stated differently, although High Sierra is in the business

---

[11]"Incidental" has also been defined as:

> Occurring or liable to occur in connection with something else; happening in fortuitous or subordinate conjunction with something else; casual or accidental; liable to happen or naturally appertaining to.

The English Language Institute of America, *The Living Webster Encyclopedic Dictionary* 485 (1975).

of gambling, the disease nevertheless occurred in conjunction with one of the inferior aspects of the casino, that is, that the pit contained extremely high concentrations of secondhand tobacco smoke.

NODA also requires that the disease followed as a "natural incident of the work as a result of the exposure occasioned by the nature of the employment."[12] NRS 617.440(1)(b). The nature of Palmer's job was that he supervised the pit, an area which exposed him to high levels of secondhand tobacco smoke. After twenty years of this exposure—which was occasioned by the nature of being a pit boss—he developed a lung disease. Palmer therefore satisfied this element of NODA.

Finally, to support its reasoning, the majority refers to Smith v. Garside, 76 Nev. 377, 355 P.2d 849 (1960), while ignoring this court's more recent decision of Desert Inn Casino & Hotel v. Moran, 106 Nev. 334, 792 P.2d 400 (1990).

In *Moran,* the claimant developed degenerative joint disease in her hands which was aggravated by her job as a masseuse. *Moran,* 106 Nev. at 335, 792 P.2d at 401. Even though she was employed by a casino, this court concluded that she suffered an occupational disease. *Id.* at 336-37, 792 P.2d at 402. Under the majority's reasoning, how is a masseuse's degenerative joint disease "incidental" to the character of a casino's business? How is it more "incidental" than a gaming room filled with high levels of secondhand tobacco smoke, especially where High Sierra exacerbated this work environment by dispersing free cigarettes to its patrons? I respectfully suggest that *Moran* is in direct conflict with the "incidental issue" portion of the majority's opinion.

Even *Smith* lends only superficial support to the majority's position. In that case, appellant worked in a printing plant, where the heat was turned off near the end of March due to the warm weather. *Smith,* 76 Nev. at 380, 355 P.2d at 851. On March 28, the temperature dropped, creating a cold environment "for all of one day and half of the next." *Id.* at 381, 355 P.2d at 851. At oral arguments on appeal, the employer conceded that the claimant had not suffered an occupational disease,[13] and we summarily stated: "This was necessarily so by reason of the requirements of

---

[12]The majority construes this requirement as the natural incident of these *businesses.* However, NRS 617.440(1)(b) actually emphasizes the nature of the *employment,* not the business.

[13]Appellant brought a common-law action for damages she suffered after being afflicted with a chest infection which developed into serious diseases. *Smith,* 76 Nev. at 379, 355 P.2d at 850. After appellant presented her case, the district court dismissed the case pursuant to NRCP 41(b) based on the ground her injury was covered under the compensation acts. *Id.*

NRS 617.440 requiring that such disease 'does not come from a hazard to which workmen would have been equally exposed outside of the employment,' and that 'the disease must be incidental to the character of the business.'" *Id.* at 382, 355 P.2d at 851-52.

Palmer has presented a far more compelling case than was presented in *Smith*. Palmer was exposed to secondhand tobacco smoke *only* at work, and this exposure occurred for over twenty years. While the *Smith* claimant was exposed to a cold environment for one and one-half days, there was no evidence concerning her lifestyle away from work. Therefore, we properly concluded in *Smith* that the claimant could have been equally exposed to the hazard outside of her workplace.

In sum, if NRS 617.440 is a catch-all provision, the appeals officer had substantial evidence to support its finding that Palmer's disease met the "incidental" requirements. These provisions seek to distinguish a disease which has developed due to the claimant's working conditions, as opposed to conditions outside of the claimant's workplace. The claimant should prevail when he can demonstrate that he was exposed to unusual harmful substances or familiar substances in unusually high concentrations. Palmer demonstrated by overwhelming evidence that he developed his lung disease as a result of the high levels of secondhand tobacco smoke at High Sierra.

### C. *Palmer was not equally exposed to secondhand tobacco smoke outside his workplace.*

### 1. *The scientific evidence demonstrates the extreme hazard Palmer faced at work.*

Secondhand tobacco smoke contains both mainstream and sidestream smoke. American Lung Association, *Indoor Air Pollution Fact Sheet, Secondhand Smoke* (1989). When the smoker inhales, he draws mainstream smoke into his mouth, and when he subsequently exhales, he exposes nonsmokers to this mainstream smoke. U.S. Dept. of Health and Human Services, *The Health Consequences of Involuntary Smoking, A Report of the Surgeon General* 7 (1986) (hereinafter *"Health Consequences"*). Sidestream smoke is the smoke which comes off the burning end of the cigarette, polluting the air with numerous chemicals. *Id.* at 7-8. There are over 4,700 chemical compounds in secondhand tobacco smoke and, of those, forty-three are carcinogenic. U.S. Environmental Protection Agency, *Indoor Air Facts, Environmental Tobacco Smoke* 1 (June 1989). Moreover, some of the substances are mutagenic and can cause permanent damage to the genetic material of cells. *Id.*

In October 1986, former Surgeon General C. Everett Koop,

M.D., stated that those exposed to heavy levels of secondhand tobacco smoke "in the same office space or workroom absorb as much smoke as if *they themselves* were 'mainstream' smoking two or three cigarettes per day." Surgeon General C. Everett Koop, M.D., Address at the Workshop on Tobacco-Free America in Minneapolis, Minn. (Oct. 16, 1986). In fact, sidestream smoke contains greater quantities of toxic chemicals than are present in mainstream smoke. *Id.* For example, tar, the most carcinogenic substance, is seventy percent more concentrated in sidestream smoke than in mainstream smoke.[14] *Id.*

Secondhand tobacco smoke persists for long periods after smoking stops. U.S. Environmental Protection Agency, *supra,* at 2. Studies show that a "single smoker in a home can double the amount of particulate air pollution inhaled by nonsmoker members of the household." *Id.* Indeed, the levels of indoor pollution caused by tobacco smoke are higher than most outdoor pollution levels. American Lung Association, *On the Air* 9 (1988). Most ventilation systems are not even designed to improve the indoor air quality; they are designed to conserve energy. *Id.* In fact, secondhand tobacco smoke cannot be removed totally from indoor air unless the source, smoking, is removed. U.S. Environmental Protection Agency, *supra,* at 2.

Health concerns prompted the Surgeon General to conduct an extensive study in this area; and in 1986, he concluded that secondhand tobacco smoke "is a cause of disease, including cancer, in healthy nonsmokers." *Health Consequences,* at 7. The report stated that secondhand tobacco smoke causes nonsmokers to develop lung cancer, acute respiratory disease, and chronic respiratory disease. *Id.* at 10.[15]

---

[14]Sidestream smoke also contains 2.5 times greater quantities of carbon monoxide, 2.7 times greater quantities of nicotine and seventy-three times greater amounts of ammonia than are contained in mainstream smoke. Surgeon General C. Everett Koop, M.D., Address at the Workshop on Tobacco-Free America in Minneapolis, Minn. (Oct. 16, 1986); *see also Health Consequences,* 7-8.

[15]The Environmental Protection Agency (EPA), classifies suspected human carcinogens into three groups: (1) Group A consists of known human carcinogens; (2) Group B consists of probable human carcinogens; and (3) Group C consists of possible human carcinogens. McKinney v. Anderson, 924 F.2d 1500, 1506-07 (9th Cir. 1991) (citing, Environmental Protection Agency, *Methodology for Evaluating Potential Carcinogenicity in Support of Reportable Quantity Adjustments Pursuant to CERCLA Section 102,* 13-16 (1988)), *vacated on other grounds,* Helling v. McKinney, 112 S.Ct. 291 (1991). Examples of Group A include arsenic, asbestos, benzene, and chromium compounds. *Id.* In 1990, the EPA released a draft report wherein it classified secondhand tobacco smoke as a Group A carcinogen, a known human carcinogen. Environmental Protection Agency, *Health Effects of Passive Smoking; Assessment of Lung Cancer in Adults and Respiratory Disorders in Children; External Review Draft,* 55 Fed. Reg. 25,874 (1990).

## 2. The uncontroverted evidence demonstrates that Palmer was not equally exposed outside of work.

Palmer presented *uncontroverted* evidence that he was exposed to smoke only at work, that he was not a smoker, that he did not associate (or live) with smokers, that he spent his free time participating in outdoor activities, and that he exercised regularly. In addition, Palmer presented uncontested medical testimony that his disease was caused by the exposure to the secondhand tobacco smoke. In fact, after Palmer left the smoke-filled environment at work, his condition slightly improved. Finally, Palmer presented scientific evidence of the dangers associated with exposure to secondhand tobacco smoke, including findings by the former Surgeon General, C. Everett Koop, M.D.

The appeals officer therefore found that Palmer was not equally exposed to secondhand tobacco smoke outside his workplace. Nonetheless, the majority concludes that secondhand tobacco smoke is a hazard "to which workers, as a class, may be 'equally exposed outside of the employment.'" By concluding that *workers as a class may be* exposed equally (without any evidence presented at the hearing), the majority has again ignored the factual findings of the appeals officer (which was based on uncontroverted evidence) and strayed from the issue presented in this case, namely, whether Palmer was equally exposed to secondhand tobacco smoke outside of his employment. If the legislature had intended for a claimant to prove that "workers as a class" are not equally exposed outside the workplace, it could have easily so done. It did not. *See* NRS 617.440(1)(d).[16]

---

[16]The majority's broad generalization simply ignores the reality facing casino employees who work in gaming areas. To highlight, according to the Tax and License Division of the Nevada Gaming Control Board, John Ascuaga's Nugget in Sparks has over 1,200 slot machines and fifty-seven gaming tables; the Carson Nugget in Carson City has approximately 680 slot machines and twenty gaming tables. In order to accommodate smokers, these casinos provide approximately one ashtray per two slot machines and several ashtrays per gaming table. Clearly, these businesses do not provide so many ashtrays for aesthetic purposes; they are there to accommodate the heavy number of smokers who frequent these establishments.

In response to Nevada having the fourth highest cancer death rate in the nation, Dr. Edwin Savlov, president of the local American Cancer Society chapter, stated, "There's too much smoking. Just walk through the casinos." Susan Voyles, *State Ranks No. 4 in Cancer Deaths*, Reno Gazette-Journal, June 23, 1992, at 1A. One needs only to take such a stroll through a busy casino to dispel any idea that a nonsmoker, such as Palmer, is equally exposed to secondhand tobacco smoke outside of work. Such an excursion will linger for a long period on the traveler's person and clothes, as the bad odors produced by tobacco smoke clings to one's clothes, hair and skin. American Lung Association, *Facts About . . . Secondhand Smoke* 3 (1990). "This is because while certain chemicals created by burning tobaccos cause

I respectfully submit that under applicable law, we must affirm the appeals officer's finding that Palmer was not equally exposed to secondhand tobacco smoke outside his workplace because there is substantial evidence to support this finding, *Christensen,* 106 Nev. at 87-88, 787 P.2d at 409-10, and no evidence whatsoever to the contrary.

## Conclusion

The majority has implicitly transformed NRS 617.440 into a catch-all provision—a metamorphosis which is neither supported by the clear language of the statute nor the legislature's intent. In my opinion, NODA is restricted to those occupational diseases statutorily listed. I would therefore hold that Palmer's lung disease which was caused by secondhand tobacco smoke is not a compensable occupational disease. If, however, NRS 617.440 could be properly construed as a catch-all provision, I would then be compelled to hold that Palmer asserted a compensable occupational disease, for he presented substantial evidence to satisfy the requirements of NRS 617.440. Consequently, I respectfully concur only in the result.

STEFFEN, J., concurring:

Although I join in the opinion written by my brother SPRINGER, I have also elected to write a separate concurrence in order to address certain aspects of this unfortunate case that were either not raised in the court's opinion or were not responsive to certain points raised in the concurring opinion by my brother YOUNG.

As a general proposition, I suggest with substantial reluctance that Palmer's claim for relief under the provisions of the Nevada Occupational Disease Act (NODA) must be denied because all of the deleterious effects of smoking, even to assiduous non-smokers like Palmer who have suffered from exposure to secondary smoke, must currently be recognized as products of a non-venereal form of "social disease." For many years the government has promoted the tobacco industry in this country through subsidies and price-supports. Until comparatively recent years, smoking was almost uniformly promoted as a socially desirable and fashionable habit that left non-smokers with few public havens to avoid air polluted by smokers. Indeed, even today, smoking is promoted in advertising and the entertainment industry as being idiosyncratic to any number of attractively portrayed people.

It is in this milieu of socially acceptable tobacco pollution that

---

bad odors, other chemicals actually help the odors to hold onto the surface that they penetrate." *Id.*

almost every aspect of public intercourse became immersed. Not unexpectedly, casinos were hardly an exception. Even the airlines formerly distributed free samples of cigarettes in furtherance of the ubiquitous effort on the part of the tobacco companies to place ever increasing percentages of humankind within the shackles of their products. The results have been predictable, and despite the belated efforts of the United States Government and certain health agencies and medical groups to enlighten the American public on the serious health hazards associated with smoking—or with exposure to secondary smoke created by others—vast numbers of our citizens remain addicted to tobacco.

Although Palmer has produced strong evidence of his success in avoiding environmental tobacco smoke to any great degree other than at his place of employment at the High Sierra, I am thoroughly persuaded that our Legislature never contemplated the inclusion of disease attributable to tobacco smoke within the purview of NODA. Unfortunately, the pervasive problems related to smoking that continue to plague society and its taxpayers (whether in the form of taxpayers' subsidies on the enormous health costs that are generated through tobacco-caused illnesses, or in attempting to provide educational disincentives for smoking, or in progressively freeing our public buildings and other public places from tobacco pollution, to name but a few) provide definition to the extent of potential problems that could arise from judicially engrafting tobacco-related diseases within our legislatively created scheme of workmen's compensation. The judicial laboratory is ill-equipped to define the financial and administrative impact that would result from making smoke-related or smoke-caused disease compensable under NODA. Clearly, the Legislature is best suited for undertaking the studies, conducting the hearings, and determining the consequences that would ensue from including disease from exposure to secondary tobacco smoke in the work place within the categories of disease that are compensable under NODA. It is substantially on this basis that I concur in the denial of benefits to Palmer.

I deem it unwise to simply leave unchallenged the position asserted by JUSTICE YOUNG which, with certain statutory exceptions, would limit relief under NODA to the twenty-two diseases identified under NRS 617.450. Although the issue addressed by my colleague's concurrence was not raised on appeal, and was thus disregarded in the majority opinion, I am reluctant to risk the possibility that failure to respond may be viewed by some as a form of deference for the position.

I do not accept the proposition that the Legislature, either by the wording of its statutes or the most limited of its contemplations, ever intended to provide relief only to those employees who

fall prey to the twenty-two identified diseases, while denying relief to those who suffer occupational disease of a type not yet catalogued under NRS 617.450. The result of such a scheme would be unfair, discriminatory, and most probably lacking in a rational basis.

Before addressing what I consider to be a fallacious view of the statutory language by JUSTICE YOUNG, I note that the general approach he assumes concerning relief for employees impacted by occupational disease is contrary to the position we have consistently taken in our cases concerning the policy served by Nevada's industrial insurance system. JUSTICE YOUNG proceeds from the premise that any ambiguity in NODA (and I find none regarding the point under discussion) should be resolved "in favor of the legislature's restrictive intent." This court, on the other hand, has declared that:

> [C]ompensation laws were enacted as a humanitarian measure. The modern trend is to construe the industrial insurance acts broadly and liberally, to protect the interest of the injured worker and his dependents. A reasonable, liberal and practical construction is preferable to a narrow one, since these acts are enacted for the purpose of giving compensation, not for the denial thereof.

Nevada Indus. Comm'n v. Peck, 69 Nev. 1, 11-12, 239 P.2d 244, 248 (1952). *See, e.g.,* Spencer v. Harrah's Inc., 98 Nev. 99, 641 P.2d 481 (1982) (humanitarian purposes of workmen's compensation laws compels liberal construction in favor of claimants); Desert Inn Casino & Hotel v. Moran, 106 Nev. 334, 792 P.2d 400 (1990) (workmen's compensation statutes must be liberally construed consistent with legislative intent to protect workers).

Turning to the pertinent statutes, JUSTICE YOUNG contends that NRS 617.450 exclusively identifies the particular occupational diseases that may constitute the basis for a claim by an afflicted employee.[1] I disagree. The Legislature has been able to identify and itemize specific diseases that are most often employment-related, and describe the employment process or environment that is conducive to contraction of each such disease. *There is nothing endemic to the identified diseases that would prompt the Legislature to grant relief to employees suffering from those diseases while denying relief for work-generated diseases not identified on the list.* This is precisely why the Legislature pro-

---

[1]JUSTICE YOUNG's concurrence also recognizes the special relief available to firemen and police officers for certain diseases provided for under chapter 617 in addition to relief stated separately concerning silicosis. Other than these "exceptions," the position taken by my colleague would limit relief for occupational disease to the twenty-two diseases listed under NRS 617.450.

vided an additional basis for relief for non-listed, work-generated diseases in the language of NRS 617.450.

The statutory language of NRS 617.450 commences as follows: "The following diseases, *as well as other occupational diseases defined in NRS 617.440*, shall be considered occupational diseases . . . ." (emphasis supplied). The highlighted phrase clearly means "to the same extent or degree as" the identified diseases. The phrase incorporates as additional covered diseases those which are not identified by name but by the criteria defined under NRS 617.440.[2] JUSTICE YOUNG's rationale would render NRS 617.440 redundant and meaningless by characterizing it as addressing only the causation element required for recovering industrial compensation. Moreover, my colleague further opines that NRS 617.440 is not a "catch-all" section from which the list of covered diseases may be expanded by judicial fiat. I suggest that JUSTICE YOUNG misperceives both the intent and the effect of the statute.

First, NRS 617.440 advances the basic purposes of the State Industrial Insurance System (SIIS) by providing a basis for relief to employees who have contracted an unnamed occupational disease as a result of their employment. NRS 617.440 stands as a tacit recognition by the Legislature that its index of occupational diseases does not purport to be complete, and that all employees who suffer occupational disease traceable to their employment are entitled to compensation. Second, NRS 617.440 is self-executing and does not require activation by judicial fiat. The statute sets forth the criteria necessary for a sustainable claim in terms readily understood and implemented by SIIS. The statute

---

[2]NRS 617.440 reads as follows:

    1. An occupational disease defined in this chapter shall be deemed to arise out of and in the course of the employment if:

    (a) There is a direct causal connection between the conditions under which the work is performed and the occupational disease;

    (b) It can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;

    (c) It can be fairly traced to the employment as the proximate cause; and

    (d) It does not come from a hazard to which workmen would have been equally exposed outside of the employment.

    2. The disease must be incidental to the character of the business and not independent of the relation of the employer and employee.

    3. The disease need not have been foreseen or expected, but after its contraction must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a natural consequence.

    4. In cases of disability resulting from radium poisoning or exposure to radioactive properties or substances, or to roentgen rays (X-rays) or ionizing radiation, the poisoning or illness resulting in disability must have been contracted in the State of Nevada.

does not provide a basis for excluding coverage to workers smitten by occupational diseases that have not yet found their way onto the list set forth in NRS 617.450.

JUSTICE YOUNG gravely declares that the court is "creating a breeding ground" for modern occupational diseases that could provide a "crushing impact" on our "financially floundering" industrial insurance system. My colleague thus apparently justifies a scheme where only certain favored workers are compensated for occupational disease, while others are denied protection based upon some arbitrary classification or omission from classification. Such has never been the intent or the thrust of our workmen's compensation system. If the system is floundering financially, and there are indications that financial difficulties do exist, the solution is not to dispense relief by caprice or favor. JUSTICE YOUNG may as well argue that a suffering worker's entitlement to compensation for occupational disease should be determined by a coin toss. Such methodology, no more unfair than that espoused by my colleague, would certainly provide financial relief to the system.

Finally, JUSTICE YOUNG throws a gratuitous sop to our societal victim, Palmer, by devoting substantial print indicating why, if he were to interpret the statutes consistent with today's opinion, he would rule in favor of Palmer. I am unable to resist extending the exercise to the extent of noting that despite the cogent evidence Palmer produced indicating that his disease is attributable to secondary smoke at his place of work, he does not satisfy the criteria set forth in NRS 617.440(2) which requires that the disease be incidental to the *character of the business.*

There is nothing inherent in casino operations that requires a smoke-laden environment. Gaming could occur in the midst of patrons presenting odoriferous problems in personal hygiene just as well as it could in the midst of secondary tobacco smoke. Both conditions would be offensive to many, but neither is essential to gaming nor a characteristic of the business. As indicated by JUSTICE SPRINGER in the court's opinion, coal dust is an expected and incidental characteristic of the coal mining industry, but smoking and secondary smoke is not a characteristic of gaming operations. An analysis of the twenty-two diseases and the processes by which they are contracted, as specified under NRS 617.450, reveals the point made here. Without exception, the listed diseases represent conditions precipitated by processes of production, handling or use within the business or industry. In neither NRS 617.440 nor NRS 617.450 is provision made for coverage for diseases arising out of social practice, habit, or convenience that are unrelated or non-incidental to the nature or characteristics of the business in which the worker is engaged.

Unfortunately, this is another reason why Palmer would not be entitled to compensation under the circumstances of this case.