MARIE SEAMAN, APPELLANT, v. McKESSON CORPORA-TION, DBA GEO THERMAL FOOD PROCESSORS, RESPONDENT.

No. 20954

February 4, 1993                                    846 P.2d 280

[Rehearing denied April 21, 1993]

*Richard J. Bortolin,* Las Vegas, for Appellant.

*McDonald, Carano, Wilson, McCune, Bergin, Frankovich & Hicks* and *Timothy E. Rowe,* Reno, for Respondent.

## OPINION

By the Court, SPRINGER, J.:

This appeal comes to us from the judicial review of administrative proceedings. The district court reversed an administrative decision that appellant, Marie Seaman, was entitled to occupational disease coverage. We conclude that the district court erred in denying occupational disease coverage to Seaman and order her claim reinstated. ·

Seaman contracted a rare lung disease called aspergillosis as a result of her work as a laboratory technician in an onion processing plant owned by her employer, McKesson Corporation. Contracting aspergillosis on the job caused Seaman to become completely disabled for approximately two years. Eventually, symptoms of Seaman's aspergillosis went into remission, after which no further compensation claim was made for this occupational disease.

After the symptoms of aspergillosis had subsided, Seaman began suffering from another disease called sarcoidosis. Believing that this disease was caused by the aspergillosis, Seaman brought an occupational disease claim against McKesson. When McKesson denied the claim, Seaman contested the denial before a Nevada Department of Administration hearing officer. The hearing officer ruled that Seaman's sarcoidosis had been caused by the aspergillosis and that, therefore, Seaman's disease was work-related. This holding was affirmed by an appeals officer of the same department, who held that Seaman's sarcoidosis was an occupational disease under NRS 617.440.[1] McKesson then

---

[1]NRS 617.440 states, in pertinent part, the following:

　　1.　An occupational disease defined in this chapter shall be deemed to arise out of and in the course of employment if:

　　(a) There is a direct causal connection between the conditions under which the work is performed and the occupational disease;

sought judicial review of the appeals officer's decision. The district court reversed the appeals officer's decision, finding that Seaman had not produced sufficient evidence to support the causal connection between her employment and the sarcoidosis.

It has been a long-standing policy of this court to construe the worker's compensation laws liberally in order to protect injured workers and their families. Hansen v. Harrah's, 100 Nev. 60, 63, 675 P.2d 394, 396 (1984). When reviewing an agency decision, the court "may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact"; instead, we must determine whether substantial evidence supports the agency's decision. SIIS v. Christensen, 106 Nev. 85, 87-88, 787 P.2d 408, 409 (1990).

Under NRS 617.440(1)(a), the claimant must show that "[t]here is a direct causal connection between the conditions under which the work is performed and the occupational disease."[2] In order to meet this burden, the claimant must demonstrate, by a preponderance of the evidence, that the disease was caused by the occupational environment. In other words, the claimant must show, with medical testimony, that it is more probable than not that the occupational environment was the cause of the acquired disease. Sacred Heart Medical Center v. Washington Dept. of Labor, 600 P.2d 1015, 1018-19 (Wash. 1979). As the Washington court stated in Zipp v. Seattle School District, 676 P.2d 538, 544 (Wash.Ct.App. 1984):

> The claimant need only establish the probability of a causal connection. It is only when the "verbal gymnastics" of a medical witness leave nothing of an objective nature in the record upon which the [factfinder] could reasonably rely to find the necessary causation that a challenge to the sufficiency of the evidence should succeed.

In the present case, the district court erred when it reversed the appeals officer's decision; the medical testimony presented in the

(b) It can be seen to have followed as a natural incident of the work as a result occasioned by the nature of the employment;

(c) It can be fairly traced to the employment as the proximate cause; and

(d) It does not come from a hazard to which workmen would have been equally exposed outside of the employment.

[2]Because Seaman's aspergillosis was irrefutably caused by her work environment, the only question raised on this appeal is whether the causal connection between Seaman's aspergillosis and sarcoidosis is sufficient. Thus, we need not consider NRS 617.440(1)(b)-(d).

initial hearing was sufficient to support the officer's finding of a causal connection between Seaman's work-related aspergillosis and her sarcoidosis. At the hearing, Dr. Michael Johnson, a pulmonary specialist and Seaman's treating physician, testified that "[m]y ultimate conclusion is that her sarcoidosis was precipitated by the aspergillosis." In addition, Dr. Edward J. O'Neill, a specialist in occupational diseases and toxicology, stated in a written opinion that, "[n]ormally, [aspergillus] is not a fungus that we would anticipate to cause disease, but in an individual such as this patient it appears to be medically probably what occurred."

This evidence constitutes substantial evidence on which the administrative officer could have reasonably relied in concluding that causation was present in this case. McKesson argues, however, that the above testimony is refuted by the record as a whole. More specifically, McKesson contends that the written testimony of the other expert physicians showed that aspergillosis was only a *possible* and not a probable cause of Seaman's disease. McKesson further asserts that this written testimony was clearly the most credible evidence before the hearing officer. For this reason, McKesson claims, the district court was correct in reversing the appeals officer's decision.

McKesson is correct in stating that the hearing officer heard conflicting evidence on the causation issue; but, of course, issues of fact are properly resolved by the factfinder and not by the reviewing court. Sierra Creek Ranch v. J.I. Case, 97 Nev. 457, 460, 634 P.2d 458, 460 (1981); Douglas Spencer v. Las Vegas Sun, 84 Nev. 279, 282, 439 P.2d 473, 475 (1968). The record in this case reveals that while some of the doctors were unable to find a clear causal relationship between Seaman's aspergillosis and sarcoidosis, other doctors testified that such a relationship did, in fact, exist. The hearing officer believed the doctors who testified that causation was present. Such a decision was based on credibility determinations and thus is not open to appellate review. We therefore reverse the district court order and reinstate the decision of the appeals officer.

Rose, C. J., and Steffen, J., concur.[3]

Young, J., dissenting:

I believe it was Mark Twain who said, "Money isn't the root of all evil . . . rather, it's the lack of money." Presumably, the SIIS board of directors understands, if not appreciates, Twain's wry comment. For if there were ample funds to pay proliferating insurance claims, the daunting problems now facing SIIS (which

---

[3]The Honorable Miriam Shearing, Justice, did not participate in the decision of this matter.

could face bankruptcy) would disappear like budget surpluses, in better times, in the waning days of our legislature.

### Recent history of SIIS

Reports have flourished in the past few years about ineptitude in SIIS management, abuses by claimants, greed by lawyers, unnecessary treatment by doctors and a litany of other factors—all of which have conspired to create the present crisis. However, in fairness, we must recognize that any system insuring approximately 600,000 Nevada workers will have critics—ranging from disgruntled claimants who know benefits are too low, to employers who are equally sure that premiums are too high—and, perish the thought, to others perhaps skirmishing for monetary or political advantage. Unfortunately, much of the criticism seems to be rooted in fact.

Beyond dispute, the system is in trouble. It is difficult to argue with arithmetic. A SIIS report indicates that on July 1, 1991, the book value of SIIS reserves was $667 million.[1] By June 30 of the following year, this had dropped to $573 million. Senator Randolph Townsend, a leader in the move to improve SIIS, stated in January of this year that the system is now losing approximately $2 million a week.[2]

The Forecast projects that without premium increases, the book value of SIIS reserves at the end of fiscal year 1996 will be zero dollars.[3] Quoting again from the inimitable Twain, it is apparent that the system is "fast rising from affluence to poverty."

Some Nevadans are asking, "Who's in charge, if anybody?" Our statutes state, "The system must be supervised by a board of directors which consists of seven members appointed by the governor." NRS 616.1703(1). The board relies heavily, perhaps sometimes too heavily, on a manager who serves at its pleasure.

By law, the directors are required to employ an independent actuary and "arrange for an annual actuarial valuation and report of the soundness of the system . . . ." NRS 616.1709(6). Further, "[t]he executive and legislative departments of the state government shall regularly review the system." NRS 616.1701(2).

With these statutory provisions to vouchsafe the soundness of

---

[1]FINANCIAL FORECAST & STRATEGIC PLAN, State Industrial Insurance System, June 23, 1992, (the "Forecast") at 24.

[2]State Insurance Commissioner Teresa Rankin, apparently seeking to trump that, told legislators that SIIS "loses more than $1 million a day, despite assertions to the contrary by the system's general manager." Ed Vogel, *SIIS loses big daily,* CARSON CITY APPEAL, Jan. 20, 1993, at A3.

[3]Forecast at 24.

SIIS, it is hard to understand how something could have gone this far wrong. But, manifestly, it has!

The latest SIIS audit, performed by Tillinghast and Peat Marwick, nationally recognized actuarial firms, showed that they system has unfunded liability of $1.4 billion. In other words, if SIIS closed its doors today, it would need this sum of money to pay existing claims.

Governor Miller, apparently not satisfied with the SIIS audit, ordered another independent audit at taxpayers' expense. This audit stated that the unfunded liability was $2.2 billion, $800 million more than the SIIS figure. This $2.2 billion is about equal to the last general fund appropriation for the biennial state budget!

This disparity apparently stems from the use of different accounting principles in handling income from reserves. The ease with which these figures (almost beyond the comprehension of most of us) are bandied about brings to mind the remark of U.S. Senator Dirkson of Illinois, who reportedly said during floor debate on an appropriation bill, "A billion here and a billion there, and pretty soon we're talking about real money!" Whichever audit figure from the raging actuarial battle is accepted, it is apparent that SIIS is "talking about real money."

How much is a billion? Probably few people besides Ross Perot really know . . . or would tell! If Columbus had started a business in 1492 and lost $1,000 a day up to the present time, he would have another 2,238 years before his total losses would reach $1 billion.

It has been well said that a sick patient often needs strong medicine. SIIS's lifestyle of the past must be modified to avoid a terminal illness.[4] The system could well heed the warning of the politician to his constituents who, when discussing deficit financing, said, "If our income does not equal our outgo, our upkeep will be our downfall!"

### Who's to blame?

It would be easy to point the finger of blame solely at the board of directors. To paraphrase Emerson, every institution is a reflec-

---

[4]Montana's recent history shows the difficulty encountered in failing to timely adopt reform for a system in financial trouble. The Montana experience suggests that a quick fix is not likely. The Montana workers' compensation system developed an unfunded liability in the early 1980s and became insolvent. The 1987 and 1989 legislatures passed reform measures. In 1990 a special legislative session was called to address unfunded liability which had grown to about $200 million. The 1991 session authorized state bonds to finance old and unfunded liability which as of June 30, 1991, exceeded $400 million. The governor and legislature will be considering further reforms in the 1993 legislature for a system still mired in fiscal quicksand.

tion of those at the top. This would be easy, too easy—and perhaps unfair. The board would seem to have primary responsibility, but other groups, individuals and influences beyond the board's control have contributed significantly to the problem. Perhaps the old proverb, "The more cooks, the worse the broth," is somehow applicable.

For example, statutory law required SIIS to refund nearly $51 million from its reserves from fiscal 1982 to 1986.[5] Later when it was apparent that reserves were dwindling, the insurance commissioner reduced a requested increase in premiums.

Claims have soared.[6] Medical expenses have skyrocketed.[7] Decisions by the hearings officers and appeals officers in the Department of Administration (a part of the executive branch, outside of SIIS) have extended coverage—often, in my opinion, beyond legislative parameters.

Our judicial decisions have consistently stated that statutes should be construed liberally to provide coverage and expanded benefits. For example, in SIIS v: Kelley, 99 Nev. 774, 671 P.2d 29 (1983), the supreme court stated that if a *preexisting condition* is aggravated, precipitated or accelerated by a work-related cause, the employer is responsible for the entire condition. Thus, if a non-resident claimant has a congenital hip defect, which first becomes symptomatic by injury in the first hour of work in Nevada, his employer and SIIS will have to pay for a hip replacement, if necessary, and various benefits such as support, rehabilitation training, and disability with lifetime reopening benefits.

Further, some observers fear that if the present trend continues and a large number of Nevadans remain *sans* health and automobile insurance, SIIS is in danger of becoming not just insurance for injured workmen, but also a state health insurance system of sorts . . . with the cost borne by employers—a group not aspiring to this humanitarian role!

*Is there a catch-all provision for occupational diseases in NRS 617.440 and 617.450?*

Nevada's first act for injured workmen was approved March 15, 1913. 1913 Nev. Stat., ch. 111. This act, with its subsequent amendments, is found in NRS Chapter 616. Thirty-four years later, the legislature enacted the Nevada Occupational Diseases

---

[5]Forecast at 6.

[6]In fiscal 1990, new claims registered totaled 83,259. This was up from 50,741 in fiscal 1983. STATE INDUSTRIAL INSURANCE SYSTEM BUSINESS PLAN, State Industrial Insurance System Policy, Planning and Review Division, June 1992, at 12.

[7]Medical disbursements went from $34 million in fiscal 1983 to $164 million in fiscal 1992. Forecast at 10.

Act (NODA). 1947 Nev. Stat., ch. 44. This act, with amendments, is found in NRS Chapter 617.

The list of compensable diseases and description of the processes from which these diseases arise are set forth in Section 26(b) of the 1947 act (NRS 617.450) where it stated:

> (b) Only the following diseases shall be considered occupational diseases and compensable as such, when contracted by an employee arising out of and in the course of the employment *in any process described herein.*

### Schedule

| Description of Disease or Injury | Description of Process |
|---|---|
| 1.  Anthrax | Handling of livestock wool, hair, bristles, hides, and skins. |
| . . . . | |
| 4.  Mercury poisoning | Any process involving the production or use of lead or its preparation or compounds. |
| . . . . | |
| 8.  Poisoning by gasoline, benzinine, naphtha, or other volatile petroleum products | Any process involving the production or use of gasoline, benzine, naphtha, or other volatile petroleum products. . . . |

1947 Nev. Stat., ch. 44 (emphasis added).

In 1949, the legislature amended Section 26(b). The pertinent part of the amendment is as follows:

> (b) . . . The following diseases *as well as all other occupational diseases defined in subdivision (a) of this section* shall be considered occupational diseases and *shall be* compensable as such, when contracted by an employee *and when* arising out of and in the course of the employment in any process described herein.

(New language in italics.)

### Schedule

| Description of Disease or Injury | Description of Process |
|---|---|
| 1.  Anthrax | Handling of livestock, wool, hair, bristles, hides, and skins. |
| | . . . |

1949 Nev. Stat., ch. 177.

The Language of Section 26(b) as amended is found today in NRS 617.440 and 617.450. Those favoring the unlimited cover-

age say that the 1949 amendments clearly require that Chapter NRS 617.440 and 617.450 must be interpreted as providing a catch-all provision. Therefore, expansionists contend that SIIS coverage for occupational diseases is no longer limited to the anachronistic language of NRS 617.450.

This interpretation fails to recognize that SIIS is solely a creature of the legislature. *The legislature establishes the parameters of what is compensable.* The legislature is the veritable control tower for the SIIS airship. Indeed, the legislature makes arrangements for the take-off and, as it is now painfully aware, makes arrangements to pick up the pieces when there is a crash. The flight plan cannot be changed by others once the flight is underway.

### What was the legislature's intention in 1949?

Did the legislature intend to make the 1949 amendment a catch-all for occupational diseases? In interpreting a statute, Judge Learned Hand once stated: "As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation." Guiseppi v. Walling, 144 F.2d 608, 624 (2d. Cir. 1944) (Hand, J., concurring).

In an effort to put ourselves in the place of those who "uttered the words," let us return to 1949. Nevada's fiscal climate that year was very conservative. Our citizens, including legislators, took pride in the logo, "The One Sound State." The occupational diseases act had been enacted only two years before. The legislature was not a bastion of liberalism. Reapportionment was still seventeen years away. SIIS expansionists rest their case to broaden disease coverage on a fragile reed—the 1949 amendment which passed without a single dissent in either house!

As amended in 1949, the act provided in part,

> (b) . . . The following diseases *as well as all other occupational diseases defined in subdivision (a) of this section* shall be considered occupational diseases and *shall be* compensable as such, when contracted by an employee *and when* arising out of and in the course of the employment in any process described herein.

1949 Nev. Stat., ch. 177.

This language, now contained in NRS 617.450, is followed by approximately twenty-eight diseases or injuries in twenty-two processes. The 1949 amendment, which merely *adds* to the specified diseases with what might be called a "catch-all" reference to Section 26(a), now NRS 617.440, continued to require that the diseases arise out of an "*in the course of the employment*

*in any process described herein."* (Emphasis added.) The diseases, some named and some unnamed, must come from an enumerated process.

Those arguing for the catch-all interpretation never seem to get around to addressing how these underlined words can be ignored. Indeed, if only the last five words, namely, "in any process described herein," had been eliminated with a period ending the sentence after the word "employment," my argument would fail. Moreover, if the legislature had intended to provide coverage for all occupational diseases, no purpose is served by listing the twenty-two processes with the requirement that a disease arise out of the employment in these processes. Indeed, two small brackets in the bill draft would have deleted the above language; SIIS expansionists have thus far been unable to explain away the legislature's conscious decision to retain this language.

*How has the 1949 amendment been treated by the legislature?*

If the drafters of the 1949 amendment had intended to create an all-embracing catch-all provision, some thirteen subsequent amendments to NODA commencing in 1965 would have been a wasteful and needless exercise. These include amendments: (1) establishing lung diseases as occupational diseases for firemen and police officers starting in 1965, (2) establishing cancer as an occupational disease for firemen in 1987, and (3) establishing heart disease for firemen and police officers in 1989.

To further place in perspective the magnitude of the impact of holding that 617.450 is a catch-all for occupational disease, let us turn to a list of the ten leading work-related diseases and injuries listed recently by the National Institute for Occupational Safety & Health. They are:

1. Occupational lung diseases
2. Musculoskeletal injuries
3. Occupational cancers
4. Severe occupational traumatic injuries
5. Occupational cardiovascular diseases
6. Disorders of reproduction
7. Neurotoxic disorders
8. Noise-induced hearing loss
9. Dermatological conditions
10. Psychological disorders.

Jim White, *The agony of workers' comp, State Government News,* October 1992, at 8, 10.

I am sure that the legislators who approved the 1949 bill—the only basis for the enormously expansive catch-all claim—would be shocked that anyone would think they had unanimously voted

for a measure which opened the floodgate so as to provide coverage for occupational lung diseases, occupational cancers, occupational cardiovascular diseases, occupational dermatological conditions, occupational disorders of reproduction, occupation neurotoxic disorders, and assorted occupational psychological disorders. And in a state where the world's oldest profession is legal in most counties, perhaps even a claim for occupational disease by workers testing HIV positive!

A few years ago, a nationally known politician is reported to have lamented with respect to America's condition then and what would be Abraham Lincoln's reaction. He opined, "If Lincoln were alive today, he would turn over in his grave!" This could truly be said about the legislators who passed the 1949 amendment with regard to the interpretive spin now being put on the language by expansionists!

### Judicial consideration

Strangely, NRS 617.440 and 617.450 have received slight consideration by our court. In the first case, Smith v. Garside, 76 Nev. 377, 355 P.2d 849 (1960), the claimant brought a common law action after becoming afflicted with a chest infection. In the printing plant where she worked, the heat was turned off near the end of March due to the warm weather. Then the temperature dropped, creating a cold environment for a day and a half. The trial court dismissed her case on the ground that her injury was covered under workmen's compensation. The appeal was rejected by our court on the ground that the claimant would have been equally exposed to the hazard outside of the employment and the disease was not incidental to the character of the business. She was relegated to the common law action set forth in her complaint.

The most recent case was Palmer v. Del Webb's High Sierra, 108 Nev. 673, 838 P.2d 435 (1992), where Palmer had been employed as a pit boss for twenty years and developed a lung problem. The appeals officer heard uncontroverted evidence that Palmer was not a smoker, did not socialize or live with smokers, and spent much of his time in the outdoors jogging, skiing, windsurfing and so forth.

The appeals officer concluded that Palmer suffered a compensable occupational disease under NRS 617.440 because (1) his chronic pulmonary disorder was occasioned by the nature of his employment, (2) he was not exposed to smoke in his normal life on a habitual basis, (3) his job conditions exposed him to the hazard of smoke in a greater amount than other workers, (4) his chronic pulmonary disorder was incidental to the character of being a pit boss, and (5) the disease was incidental to the charac-

ter of the business because there was no element of volitional control as Palmer could not control his exposure to the second-hand tobacco smoke.

Although Del Webb's offered no testimony whatsoever, this court in a majority opinion denied recovery stating that (1) environmental smoke in a casino "is not uniquely 'incidental to the character' of that business"; and (2) secondary smoke "is a hazard to which workers, as a class, may be 'equally exposed outside of the employment.'" *Palmer,* 108 Nev. at 674, 838 P.2d at 435. The majority did not specifically address the question of whether NRS 617.440 is a catch-all provision, although the decision seems to be bottomed on that premise.

I concurred because in my opinion NRS 617.440 is not a catch-all provision and therefore Palmer's affliction was not designated as a covered disease by the legislature.

My brother STEFFEN, in a concurring opinion, took strong issue with my suggestion that the legislature ever intended to limit relief to the named occupational diseases associated with the twenty-two processes. He stated, "The result of such a scheme would be unfair, discriminatory, and most probably lacking in a rational basis." *Palmer,* 108 Nev. at 697, 838 P.2d at 450.

His point is well taken, but merely because a statute might be viewed by some as "unfair" and "discriminatory" does not mean that it can be ignored. As Justice Oliver Wendell Holmes wisely stated, "The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed." Johnson v. U.S., 163 F. 30, 31 (1908). One man's meat is another man's poison. What might be considered fair by employees could be seen as unfair and discriminatory by employers. I am unaware of any member of the Nevada Legislature (including myself) ever admitting to the sin of voting for a bill that was "unfair" or "discriminatory." Moreover, if the litmus test for a statute is that it must have a "rational basis," the biennial Statutes of Nevada would be but a mere shadow of their historic size. If a bill violates the federal or state constitution, then we, of course, can invalidate it. Short of that, however, it is not our prerogative to question the fairness, justness, rationality or wisdom of the legislature.

### Mental stress as an occupational disease

Even if the 1949 legislature did not intend to create a catch-all provision in NRS 617.440, I suspect that by some type of evolutionary process analogous to the development of the common law, this catch-all philosophy has been accepted by SIIS and the

Department of Administration. Let me turn to just one of the diseases that would come in under this interpretation.

Apparently, some appeals officers, but perhaps not all, recognize mental stress as a compensable occupational disease. In a scholarly decision consisting of 47 pages after a three-week trial and 2,000 pages of testimony in 1988, a Nevada appeals officer concluded, after reviewing the law of a number of jurisdictions, that "gradual mental stress is compensable if the stress is in excess of the stress of everyday life and employment." *In The Matter of The Industrial Insurance Claim of CAROLYN FIENE,* Consolidated Appeal Numbers: 6556, 6591, 6886, 7092 (Nevada Department of Administration Appeals Officer's Decision, August 5, 1988) at 8 (hereinafter "Fiene Decision").

Coverage was apparently assumed under the catch-all philosophy perceived in NRS 617.440. Unfortunately for the claimant, the decision held that "none of the stressors represented situations of greater dimensions than the day-to-day mental stress and tensions which all employees must experience." Fiene Decision at 42. From the opinion, several things, none of which emanated from the legislature, can be gleaned: (1) A SIIS claims examiner, recognizing coverage, approved the claim, (2) a hearings officer in the Department of Administration also recognized coverage and approved the claim, and (3) the appeals officer recognized coverage and articulated a standard.

Opinions of appeals officers have no precedential value; they are not reported, they are not binding on claims examiners, hearings officers or appeals officers. Moreover, they can be disregarded by the same appeals officer in a subsequent hearing! To those schooled in traditional judicial proceedings, the number of appeals and manner in which they are handled make the administrative process, an intriguing system indeed!

The relation between employment and a disabling mental or emotional injury is one of the most complex issues in workers compensation law. As one writer expressed it, "The precise etiology of most mental disorders is inexplicable. Mental disorders result from an extraordinary complex interrelation between an individual's internal or subjective reality and his external or environmental reality." Joseph, *The Causal Issue in Workers Compensation Mental Disability Cases: An Analysis, Solutions and Prospective,* 36 VAND. L. REV. 263, 264 (1983).

California, with a slightly more liberal standard than that articulated by the Nevada appeals officer, has had a costly experience which might be an augury of things to come in Nevada. Mental stress claims have increased nearly 700 percent in the last decade, compared to seventeen percent for non-stress injuries. An article on the editorial page of the LOS ANGELES TIMES, Nov.

4, 1991, stated: "The stress element makes workers' compensation particularly vulnerable to abuse. A virtual cottage industry of worker compensation mills has flourished." Moreover, if the claimant is represented by the Nevada Attorney for Injured Workers (paid by SIIS), the expenses of prosecuting the claim (for dueling attorneys, paid experts and other legal expenses) will be borne by the system—as well as the comparable cost of defending against the claim! Even in victory, the system loses!

In the 1991 legislative session, SIIS drafted Senate Bill 7 which was devoted solely to coverage of illness related to stress and mental disorders. Its processing reminded me of the legislative odyssey of some of my own bills during nearly fourteen years in the State Senate. As finally enacted, the only remnant of the original bill was the number! If there was a sense of urgency by the system regarding mental illness, its fervor did not seem to ignite legislative action. As the bill was finally passed, it was apparently a vehicle for a host of other changes sought by the system with a request that SIIS "conduct a study of stress in this state."

There can be little question but that SIIS is in serious fiscal condition. A contributing factor is not only the manner in which the statutes have been interpreted, but perhaps the absence of clarity in the language employed. I dissent from the proposition that the 1949 amendment created a catch-all provision for the following reasons: (1) legislative history does not support this conclusion; (2) a careful reading of the bill and the statute does not support this conclusion; (3) the conservative temper of the times and the legislators does not support this conclusion; and (4) the subsequent treatment of this provision by the legislature does not support this conclusion.

In closing, I am reminded of the sage words of Justice Benjamin Cardozo: "The Constitution overrides a statute but a statute, if consistent with the constitution, overrides the law of judges." BENJAMIN N. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 14 (1921).

Because Seaman's case rests on the premise that there is a catch-all provision in NRS 617.440, with which I do not agree, I respectfully dissent.