JACK LARSON, Appellant, v. B.R. ENTERPRISES, INC., d/b/a RNR TOURS, and BERTRAM S. ROSS and THE ESTATE OF JOSEPHINE F. ROSS, Respondents.

No. 18336

June 24, 1988                                    757 P.2d 354

[Rehearing denied December 8, 1988]

*Gang & Berkley,* Las Vegas, *Michael, Best & Friedrich* and *Gaar W. Steiner,* Milwaukee, Wisconsin, for Appellant.

*Lovell, Bilbray & Potter,* Las Vegas, for Respondents.

---

[4]*See generally* Barnum v. Williams, 84 Nev. 37, 42, 436 P.2d 219, 222-23 (1968).

## OPINION

*Per Curiam:*

### The Facts

Larson, appellant, was the sole shareholder of Casino Holiday Inc. (hereafter "CHI"). Ross, respondent, was the sole shareholder of B.R. Enterprises (hereafter "BRE"). Both corporations arranged junket trips to Las Vegas.

On September 11, 1979, Larson and Ross entered a venture wherein they generally agreed to share the net profits of the two corporations and give each other options to purchase 50% of the other's corporation. They signed two contracts—entitled "Agreement" and "Service Contract"—detailing the terms of their agreement and relationship. At the same time, Larson paid Ross $15,000, as a down payment under a purchase option, for which Ross executed a promissory note, guaranteed by his corporation, in the event that the purchase was not consummated. The Agreement, Service Contract, and option to purchase were initially intended to expire on April 30, 1980. However, the parties later agreed to extend all three to September 11, 1981. During the two years of the venture, BRE entrusted Larson, for investment

purposes, with $60,000; Larson never exercised his option to purchase.

Toward the end of this two-year period, the relationship between the two men cooled, and they allowed the venture to end on September 11, 1981. At this time, Larson still had BRE's $60,000; Ross still had CHI's $15,000. In November, 1981, the Four Queens Hotel gave Ross $15,375 it owed CHI, for junkets CHI had produced. Ross unilaterally refunded the Four Queens $6,000, out of the $15,375, to satisfy an alleged debt of one of Larson's customers, and retained the remainder of the commission.

In May, 1982, BRE sued Larson, alleging he converted the $60,000 that BRE had placed in his trust. Larson's counterclaim against BRE and Ross sought recovery of his $15,375 Four Queens' commission plus interest, recovery of the $15,000 he had paid Ross under the purchase option, with interest, and an accounting/equitable division of the two corporations' profits, as provided by the Agreement.

Following a bench trial, the district court concluded that Larson was liable to BRE for the $60,000 BRE had given him to invest. In deciding Larson's counterclaims against BRE, the court found that BRE had converted only $9,375 of Larson's $15,375 commission from the Four Queens. The court also concluded that BRE was liable to Larson and CHI for $15,000, but no interest was due on this sum. And finally, the court, after an accounting, determined the net profits of the two corporations for the Agreement period and ordered the parties to split these profits.

## Discussion

We have appropriately held that "It is the exclusive province of the court, sitting without a jury, to determine facts on conflicting evidence and its findings, if supported by substantial evidence, should not be disturbed on appeal." Johnson v. Johnson, 89 Nev. 244, 246, 510 P.2d 625, 626 (1973) (citation omitted). Larson argues that there is not substantial evidence to support the district court's finding that Ross only converted $9,375 of the $15,375 Ross collected from the Four Queens. We agree.

In Bader v. Cerri, 96 Nev. 352, 357 n.1, 609 P.2d 314, 317 n.1 (1980), this court noted "Conversion exists where one exerts wrongful dominion over another's personal property or wrongful interference with the owner's dominion." The record contains little or no evidence that Larson authorized Ross to use his money to pay an alleged debt to the Four Queens. At the time Ross collected Larson's commission, the venture between the two men

had ended. Ross admitted, at trial, that the money was Larson's, and that he did not obtain or care about Larson's approval before paying Larson's purported debt, and that he paid the $6,000 debt to protect his own reputation. As a result, we conclude that the record clearly shows that Ross exercised wrongful dominion over the entire $15,375, and not merely $9,375 of Larson's commission. Because the district court's finding on this issue is unsupported by substantial evidence, it must be reversed.[1]

[Headnote 2]

Larson also argues that the district court erred by failing to award interest on a $15,000 loan he made to Ross. As noted, the parties' venture began after Ross made an offer to sell half of his BRE stock to Larson, which offer Larson did not accept. Larson then apparently made a counter-offer for a purchase option, whereby he would pay Ross $15,000 up front in order to reserve the right to later pay an additional amount, if necessary, to finalize the purchase of BRE stock. The parties agreed to this counter-offer. Larson's attorney prepared the three documents, including the promissory note that Ross signed detailing the treatment of the $15,000 until the option was exercised.

The Note Ross signed provides:

On or before April 31, 1980 . . . Bertram S. Ross and Josephine F. Ross, jointly and severally promise to pay to Casino Holiday, Inc. . . . the sum of Fifteen Thousand and 00/100 Dollars ($15,000.00) with interest at the rate of 10 percent per annum from date [September 11, 1979] until paid, interest payable in a lump sum upon payment of the principal amount or the due date whichever is sooner, and if not so paid, to be compounded at the lesser of 15 percent or the maximum legal rate of interest for individuals allowable by law. . . .[2]

The Agreement signed the same day designates this transfer of money as a loan.

Larson maintains that the $15,000 he paid Ross on September 17, 1979, was both consideration for a purchase option and a loan. He argues that even though the option was never exercised,

---

[1]We also note that although the district court awarded BRE interest, from October 1, 1981 until paid, on the $60,000 Larson converted, it did not reciprocate with regard to the $15,375 that Ross converted. We see no reason, under the facts, why the parties should be treated differently in this matter. As a result, the $15,375 that Ross converted will also bear interest, until fully paid, at the legal rate, from October 1, 1981.

[2]As noted, this note was later extended from April 31, 1980 to September 11, 1981.

the express terms of the promissory note mandate an award of $15,000 with interest, and the district court erred by awarding him $15,000 without interest. We agree.

The language of the note Ross signed is plain and its meaning is clear. It unequivocally provides that the $15,000 Larson paid Ross will be repaid with interest, the rate depending on when the Note is repaid. The Note, prominently labelled as such, is not long, nor are the terms detailed or complex. The parties had similar bargaining power, were experienced businessmen, and Ross had time to read the Note before agreeing to its terms. We have held that "Courts are bound by language which is clear and free from ambiguity and cannot, using the guise of interpretation, distort the plain meaning of an agreement." Watson v. Watson, 95 Nev. 495, 496, 596 P.2d 507, 508 (1979).

We conclude that the district court's finding, that the parties understood "no interest was to accrue as to the Fifteen Thousand ($15,000) Dollars paid by Defendant LARSON to Plaintiff B.R. Enterprises," contradicts the plain terms of the Note, which provides for payment of interest to Larson. Accordingly, we reverse the district court's award which disallows interest and remand with instructions to enter judgment, for Larson, in accordance with the Note's terms.[3]

Finally, Larson contends that the district court, in its accounting, failed to arrive at the proper net profit for BRE, and as a result, he was not awarded his fair share of BRE's profits under the Agreement. The Agreement provides:

> Larson/Casino and Ross/BR shall share equally, as their interests may appear, in all net profits of the two corporate entities during the period October 1, 1979, through April 30, 1980, said profits to be determined in accordance with good accounting practice consistently applied and payable, unless otherwise agreed, on June 1, 1980. For this division of profits, it is recognized that equitable adjustments may be necessary to fairly reflect operations, income, and expenses of Casino and BR during the period.

The district court determined that, during the period in question, BRE's net profit was $27,052. Accordingly, the district

---

[3]As well, we conclude that the district court also erred by holding only BRE liable for the $15,000, and not Ross as well. Under the terms of the note, Ross was the debtor, BRE the guarantor. In his third-party complaint, Larson sued Ross for the monies owed under the note. Accordingly, both Ross and BRE should be liable for repayment of the note.

court ordered BRE to pay Larson/CHI one-half of $27,052. Larson argues that in doing so, the court failed to make equitable adjustments, as allowed by the Agreement, "necessary to fairly reflect the operations, income and expenses of Casino and BR" during the two years of the venture. More specifically, Larson argues that because Ross paid himself, out of BRE's gross income, more salary than he paid Larson, and also made significant contributions to the BRE profit-sharing plan, BRE's net profit was lower than it should have been. We also agree with this contention.

In construing contracts, a "court should ascertain the intention of the parties from the language employed as applied to the subject matter in view of the surrounding circumstances." Mohr Park Manor, Inc. v. Mohr, 83 Nev. 107, 112, 424 P.2d 101, 105 (1967). We are convinced, on review of the record, that the parties intended the Agreement to ensure, during the period in question, equal compensation, rather than a mere division of profits after differing salaries were taken. Ross testified, for example, that when the Agreement was signed, he intended to "draw a thousand a week," the same salary that the parties had agreed to pay Larson. Instead, Ross apparently drew as a salary approximately $100,000 per year, or about $50,000 more a year than Larson.[4] It is apparent that the use of a net profit without consideration of above the line expenses has allowed Ross to manipulate BRE's profit and escape the Agreement's intent and spirit.[5]

Accordingly, because the district court's accounting and division did not fairly reflect the intent of the parties in entering the Agreement, and because of the other errors herein discussed, we remand for a new accounting and judgment in accordance with this decision.

---

[4]In addition, over the two years Ross apparently contributed, from BRE's gross income, about $142,000 into the profit sharing plan, which will inure to his benefit but not Larson's. To the extent that Ross's periodic contributions to the profit sharing plan during the period of his agreement with Larson exceeded the amount of his periodic contributions antedating the agreement, such excess should be divided equally between the parties.

[5]Again, the district court also erred by holding both Larson and CHI liable for Ross's half of CHI's profits, but holding only BRE liable for Larson's half of BRE's profits.