**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GERALD HESTER,
              *Plaintiff-Appellee,*

v.

VISION AIRLINES, INC.,
              *Defendant-Appellant.*

No. 11-15646

D.C. No.
2:09-cv-00117-
RLH-RJJ

GERALD HESTER,
              *Plaintiff-Appellant,*

v.

VISION AIRLINES, INC.,
              *Defendant-Appellee.*

No. 11-15761

D.C. No.
2:09-cv-00117-
RLH-RJJ

OPINION

Appeal from the United States District Court
for the District of Nevada
Roger L. Hunt, Senior District Judge, Presiding

Argued and Submitted
April 19, 2012—San Francisco, California

Filed July 18, 2012

Before: Alfred T. Goodwin, Stephen Reinhardt, and
Mary H. Murguia, Circuit Judges.

Opinion by Judge Goodwin

---

**COUNSEL**

Edward H. Wasmuth, Jr., Smith, Gambrell & Russell, LLP, Atlanta, Georgia, for the defendant-appellant-cross-appellee.

David M. Buckner, Grossman, Roth, P.A., Coral Gables, Florida, for the plaintiff-appellee-cross-appellant.

---

**OPINION**

GOODWIN, Circuit Judge:

Appellant Gerald Hester, a former pilot for Vision Airlines, sued Vision on behalf of a Class of other pilots and flight crew employees to recover "hazard pay," which Hester and the Class alleged Vision had accepted on their behalf and never paid to them. After nearly two years of discovery disputes between Vision and the Class, the district court sanctioned Vision by striking its Answer, entered default judgment against Vision, and held a jury trial to determine damages.

Vision appeals, arguing (1) that the district court abused its discretion by striking Vision's Answer, (2) that the claims in the Complaint are legally insufficient to support the default judgment, and (3) that the district court abused its discretion by certifying the Class. We reject Vision's arguments and affirm those orders. The Class cross-appeals, arguing that the district court erred in dismissing, on the morning of trial, the Class's claim for punitive damages. We agree and reverse the order dismissing the Class's claim for punitive damages.

## I.   Facts and procedural history

During the U.S. military occupation of Iraq and Afghanistan, the United States established an "air bridge" to deliver supplies through war zones to U.S. posts in Baghdad, Iraq, and Kabul, Afghanistan. The United States contracted with private airlines to deliver supplies to those posts, and it provided "hazard pay" for the pilots and crew members of those airlines.

In 2004, the United States contracted with Capital Aviation to provide bi-weekly flights to Baghdad and Kabul. The contract provided one set of funds for the flight services by Capital Aviation and another set of funds for the hazard pay for the pilots and crew members.

Pursuant to the contract, every pilot, first officer, and international relief officer was to receive $5000 in hazard pay per round-trip flight. Every other crew member on the flights, including attendants and mechanics, was to receive $3000 in hazard pay per round trip.

The contract contained a "pass-through" provision to ensure that the hazard pay actually made it to the pilots and crew members who were risking their lives by transporting supplies through war zones. The pass-through provision required Capital Aviation to pass the hazard pay through to any subcontractors, who were also required to pass the hazard pay through to their employees without taking a cut for themselves.

Capital Aviation subcontracted with Vision Airlines to provide the flights to and from Baghdad and Kabul. For the average round-trip flight, Capital Aviation received from the United States $27,000 in hazard pay on behalf of the pilots and crew members. Capital Aviation then paid that full amount to Vision.

In the summer of 2005, at the beginning of Vision's performance under the contract, Vision did pay some of the hazard pay to its pilots, but by August of that year, Vision stopped paying hazard pay to any of its employees, and it kept the money for its own benefit. In addition to ceasing its intermittent distribution of hazard pay, Vision also fired all pilots and crew members who knew about or had previously received hazard pay, and it replaced them with employees who were unaware that they were entitled to it.

In January 2009, Hester filed a class action Complaint in district court on behalf of Vison's pilots and crew members on the relevant flights. The court certified the Class. The Class's theories included unjust enrichment, money had and received, and conversion. The Complaint alleged that, since September 2005, Vision had received and retained more than $21 million in hazard pay on behalf of its pilots and flight crews, and the Class sought damages in that amount.

In April 2009, the Class sent Vision interrogatories and requests for production, requesting "all communications and documents that relate to hazard pay." Vision responded by affirming that "Defendant has no documents or communications relating to hazard pay."

In July, the Class filed a motion to compel Vision to produce the requested documents and to respond to the interrogatories. In October, the court held a hearing on the motion to compel. At the hearing, Vision told the court that it had not produced the requested documents because "there is no hazard pay." In response, the Class's counsel showed the court some of Vision's invoices, which the Class had obtained by subpoenaing third parties in Virginia. At least one invoice contained line entries such as "hazardous duty bonus," "hazardous duty flight deck bonus," "hazardous duty bonus, flight crew," and "hazardous duty bonus, cabin crew." Vision claimed that that invoice was merely an "internal document" that Vision had used to calculate the total bid, and because

Vision never actually paid a hazardous duty pay differential to any of its flight crews, there was no hazard pay. Vision also told the court that, in the contract between Vision and its upstream contractors, "there is no amount that is separated or allocated for hazard pay."

At the end of the hearing, the court denied the Class's motion to compel because the court determined that the parties had failed to meet and confer sufficiently to figure out what each side needed to produce. The court granted a 120-day discovery extension.

Vision eventually turned over some documents to the Class, but before doing so, Vision used a black marker to obscure large portions of those documents, redacting what appeared to be text, numbers, and invoice entries. Vision did not provide a privilege log or claim that the redacted information was privileged. Because of the redacted documents, the Class's expert witness was not able to complete his report by the deadline, so the Class filed a motion to extend that deadline.

The Class filed a second motion to compel, and in September 2010, the court granted that motion and ordered Vision to produce the requested documents by September 17, 2010. On September 29, the court held a pretrial conference, at which it learned that Vision still had not produced the documents as ordered. The court again ordered Vision to produce the documents. On October 5, the day after the trial was initially scheduled to begin, Vision still had not complied with the order to produce the documents, so Hester filed a motion for sanctions.

On October 8, the court scheduled a hearing and ordered Vision to show cause why the court should not strike Vision's Answer and enter a default judgment. The court's written order to show cause stated that "[t]he Court believes that Vision's conduct has interfered with the Court's ability to

hear this case, delayed litigation, disrupted the Court's timely management of its docket, wasted judicial resources, and threatened the integrity of the Court's orders and the orderly administration of justice." The written order also warned Vision that "[f]ailure to comply with the Local Rules of Practice, the Federal Rules of Civil Procedure, and the Court's orders may result in sanctions, up to and including case-dispositive sanctions."

On October 14, Vision responded to the motion for sanctions by providing a few of the requested documents. On October 15 and October 22, Vision filed supplemental responses, both of which contained a few more responsive documents.

On October 25, the court held a hearing on the show cause order. At that hearing, Harold Gewerter, Vision's counsel, affirmed that he had turned over everything that Vision had provided him:

"No, everything that we have has been provided, Your Honor." "[T]here's been no intentional delays whatsoever on my part and none on behalf of my client, it's just the system and the nature of the program and getting the proper approvals." "[T]hey have everything that my client has or has access to, Your Honor. And I have made sure that within 24 hours of me receiving anything, I've sent it out." "[T]hey have every document. There's nothing else out there. There's no surprises that are going to be produced at trial." "I assure this Court, there has been no intentional delay whatsoever. Everything that's been done is fast as it can be done . . . ." "[T]here are no other documents. I've asked that question ad nauseam to my client and other people." "We have produced all of the records that we have." "My client unfortunately doesn't keep a perfect set of records, it's been a problem and — but every record that we did have or do have has been turned over and they now have them."

At the hearing, the court also discussed Vision's failure to produce a privilege log for the redacted material and the possibility of sanctioning Vision for forcing the Class to litigate with a third party in Virginia to obtain documents that Vision should have produced. The court warned Vision on the record that, based on Vision's intentional discovery violations, the court has the authority to strike Vision's Answer and to enter a default judgment.

At one point in the hearing, the Class identified, as an example of Vision's insufficient production, a document that Vision had produced only in heavily redacted form. That single-page document was marked as "page 20," although Vision had not produced pages 1 through 19 or any pages beyond page 20. Because Vision still had not produced an unredacted version of page 20, the following exchange ensued (Mr. Gewerter represents Vision, and Mr. Buckner represents the Class):

> THE COURT: Okay. I want to stay with this document. Do you have access to this document unredacted?

> MR. GEWERTER: I have access but the one I have is actually a little bit larger but it's the same thing, just so you know that.

> THE COURT: Do you know what — do you know what the nature of the items that are redacted are?

> MR. GEWERTER: Yes. I found those out, yes. Your Honor, I have — do I have a copy of the unredacted version? I have a — I do have that now, yes, and I thought it was attached to the — I was out of town last week.

> THE COURT: I understand you were out of town.

MR. GEWERTER: And I thought this was attached to — even though it's not part of the contract, it's post-contract, it's really a reasonableness test, I do now have it. This was done — I'm on the cell phone back in Washington talking to my secretary trying to coordinate on this as e-mails were coming into my office.

THE COURT: You do have an unredacted copy of this?

MR. GEWERTER: Yes, the only thing is —

THE COURT: Can you give an unredacted copy to the plaintiff?

MR. GEWERTER: I will then, Your Honor.

THE COURT: Today.

MR. GEWERTER: Except the one they're going to get, so they don't think it's any different, the print itself is a little bit larger and it looks like it was — but it's the exact same document, somehow it got printed differently, but it's the same document.

THE COURT: All right.

MR. BUCKNER: Judge, actually we'd like the whole document, not just — obviously it's Page 20 of something. I mean, we'd like the whole thing.

MR. GEWERTER: That's the end of the contract. What happens is when they're all done with the contract they then physically affix this to the contract to go upstream to McNeil I should say and that's how this — this document is post —

THE COURT: Are there 19 pages then in the contract and then this is the 20th page?

MR. GEWERTER: I don't have it because, you know, the contract's printed off different ways and there is one version with 19 pages. There's some version with different amounts of pages. Unfortunately it depends on whose computer you get this off of, so there's nothing else out there, Your Honor. I have asked from the horse's mouth, Is there anything else out there? and I was told from six other people sitting in a room with nine people, There's nothing else out there, last Friday morning.

. . . .

THE COURT: So, if I understand what it is that you've told the Court is, is that except for this document [Page 20] which is now redacted that you have an unredacted copy and that you can provide, as to all the other documents that Mr. Buckner has talked about that it is your understanding from Vision that the documents either do not exist or what does exist have been disclosed?

MR. GEWERTER: That's correct.

The court then ordered Vision to produce a unredacted version of Page 20 to the Class by the end of that day, October 25. Vision did not produce Page 20. Instead, Vision produced a different document, labeled "Section 6.3.3," which had never before been produced, although it was responsive to discovery requests. Also, Vision did not produce the larger document of which Section 6.3.3 was apparently a part.

On November 3, the court ordered Vision's Answer stricken, default judgment entered, and a jury trial to be held

to determine damages. The court explained Vision's discovery violations in a written order.

That same day, Vision finally turned over an unredacted version of Page 20. Vision's counsel stated that he had "just received [Page 20] minutes ago from a secure location." Vision did not produce pages 1 through 19 or any other pages of the larger document.

A few days later, the court held the jury trial on damages. Before the jury was selected, the court ordered that "the jury will not be permitted to entertain punitive damages" because "the complaint does not establish sufficient evidence, nor clear and convincing evidence as required by the Nevada Revised Statutes," of conduct justifying punitive damages. After two days of trial, the jury returned a damages verdict of $4,509,268, which, after including interest and costs, became a judgment totaling $5,270,230.06.

## II.   Discussion

We first address the district court's order striking Vision's Answer. A court's order imposing sanctions is reviewed for abuse of discretion. *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 786 (9th Cir. 2011); *Jorgensen v. Cassiday*, 320 F.3d 906, 912 (9th Cir. 2003). "If a party . . . fails to obey an order to provide or permit discovery," the court may impose sanctions, including "striking pleadings in whole or in part." Fed. R. Civ. P. 37(b)(2)(A)(iii); *see also, e.g.*, *Dreith,* 648 F.3d at 786. "Where the sanction results in default, the sanctioned party's violations must be due to the willfulness, bad faith, or fault of the party." *Jorgensen*, 320 F.3d at 912 (internal quotation marks omitted). A court's finding that conduct is willful or in bad faith is reviewed under the "clearly erroneous" standard. *Id.*

In this case, the district court found that "Vision has intentionally delayed production of documents, misrepresented its

current and past production to both the Court and the Class, and otherwise engaged in bad faith conduct." The court's findings (1) that Vision violated the court's discovery order and (2) that Vision did so willfully and in bad faith are both supported by evidence in the record and the court's own credibility determinations. Vision does not argue that it did not violate the discovery order or that its actions were not willful and in bad faith.

Vision's sole argument is that the district court abused its discretion because it failed to consider less drastic sanctions, which is one of the factors that a district court must consider before striking a pleading. *See, e.g.*, *Dreith*, 648 F.3d at 788. Because the district court thoroughly discussed less drastic sanctions in its written order, Vision's argument is meritless.

Although a default judgment sanction is "a harsh penalty imposed only in extreme circumstances, we will overturn [it] only if we have a 'definite and firm conviction that it was clearly outside the acceptable range of sanctions.' " *Id.* (citation omitted) (quoting *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 130 (9th 1987)).

**[1]** A court must consider the following five factors before striking a pleading or declaring default: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Id.* (internal quotation marks omitted).

**[2]** In this case, the district court considered each of those factors and made the following determinations:

(1) "[T]he public interest in the expeditious resolution of cases . . . [is] best served by striking Vision's answer and entering a default against it."

(2) "[T]he Court's interest in managing its docket [is] best served by striking Vision's answer" because Vision's "intentional, bad faith conduct in the discovery process" "has led to multiple hearings and motions before this Court which have nothing to do with the merits of this case, but have been necessary due to Vision's misconduct. These extra motions and hearings have interfered with the Court's ability to efficiently manage its docket in a manner fair to all parties with pending cases."

(3) "Vision's conduct has prejudiced the Class and limited the Class' ability to try this case . . . ."

(4) "While public policy favors that cases be heard on their merits, Vision has done everything it can to prevent such resolution. Through its conduct, Vision has attempted to ensure that an accurate and fair trial on the merits of this case will never happen."

(5) The court devoted special attention to the availability of less drastic sanctions. It "carefully weighed the impact and severity of this sanction and . . . considered whether alternative sanctions would be sufficient," but it "determined that no alternative sanction would be sufficient and Vision's conduct warrants striking its Answer." The court explained why neither a discovery extension nor an adverse inference instruction would be sufficient under the circumstances.

**[3]** Vision's argument that the court failed to adequately consider less drastic sanctions relies on *Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112 (9th Cir. 2004) (per curiam), in which this court identified three factors to assess whether a district court had adequately considered less drastic sanctions: (1) whether the district court "explicitly discussed the alternative of lesser sanctions and explained why it would be inappropriate," (2) whether the district court had "implemented lesser sanctions before ordering the case dismissed,"

and (3) whether the district court had "warned the offending party of the possibility of dismissal." *Id.* at 1116.

In this case, the district court warned Vision on the record several times about the possibility of a case-dispositive sanction, and the court's written order contained an explicit, three-and-a-half-page discussion of why less drastic sanctions were insufficient. Therefore, because the first and third factors of *Computer Task Group* show that the court did adequately consider lesser sanctions, Vision's argument focuses on the second factor, emphasizing that the district court did not implement lesser sanctions before striking Vision's Answer.

**[4]** The fact that a court does not implement a lesser sanction before striking an answer is not dispositive. It is just one factor. And Vision's own authority*, Computer Task Group*, minimized that factor by holding that, in light of the defendant's "willful disobedience," the district court "could reasonably conclude that additional lesser sanctions would be pointless" because "[i]t is appropriate [for a district court] to reject lesser sanctions where the court anticipates continued deceptive misconduct." *Id.* at 1116-17 (first alteration in original) (quoting *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 352 (9th Cir. 1995)).

**[5]** Here, the district court considered Vision's willful disobedience, the pointlessness of lesser sanctions, and its anticipation of continued deceptive conduct by Vision:

> In the Court's view, Vision will act to delay this litigation and prevent discovery by any means necessary. The Court has no reason to believe that given an extension Vision would now begin to adhere to its obligations and comply with the Court's orders. Nor does the Court believe that Vision could rectify the harm that it has already caused by not preserving documents. To extend discovery would merely give

Vision what it desires—further delay—and would simply validate Vision's misconduct.

. . . .

. . . It has also become evident that Vision is willing to mislead the Court time after time in order to keep from producing relevant, possibly critical, discovery material.

**[6]** Accordingly, the district court did not abuse its discretion in striking Vision's Answer because it applied the correct law and made findings that were supported by evidence in the record.

We now turn to Vision's argument that the claims and allegations in the Complaint are insufficient to support a default judgment. We review the Complaint de novo, *see Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005), and we hold that the Complaint is legally sufficient.

**[7]** When a default judgment is entered against a party, that party may appeal the sufficiency of the Complaint, but " 'facts alleged to establish liability are binding upon the defaulting party, and those matters may not be relitigated on appeal.' " *Alan Neuman Prod., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988) (quoting *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978)). The appeal should focus on the legal sufficiency of the claims themselves and whether those claims are supported by factual allegations in the Complaint. *E.g.*, *id.*

**[8]** First, Vision unpersuasively argues that the claims for unjust enrichment, money had and received, and conversion are merely conclusory. For each claim, Vision identifies a few miscellaneous, irrelevant facts that are not alleged in the Complaint, but Vision provides no explanation of which elements of the claims are unsupported by factual allegations.

Second, Vision argues that, in Nevada, conversion applies only to personal property and not to money. The Nevada Supreme Court disagrees. *Larson v. B.R. Enters., Inc.*, 757 P.2d 354, 355-56 (Nev. 1988). In Nevada, a defendant's wrongful dominion over a plaintiff's commission of money is sufficient for a conversion claim, even when no personal property is involved. *Id.* Vision's argument fails.

Third, Vision disputes the facts as they appear in the Complaint. The Complaint alleges "There is no employment contract between Vision and any of the Class members who served as crew members on the flights to and from the airports in Baghdad and Kabul." Vision argues that the Class members did have express employment contracts with Vision and that those contracts preclude the Class's claims for equitable relief.

**[9]** We reject Vision's argument because it is merely an attempt by Vision to relitigate the facts alleged in the Complaint. Furthermore, throughout discovery, Vision never produced a single employment contract for any Class member, so Vision's version of the facts is unsupported. The Class members were almost certainly at-will employees. *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 884-85 (Nev. 1999); *Am. Bank Stationary v. Farmer*, 799 P.2d 1100, 1101-02 (Nev. 1990) ("[A]ll employees in Nevada are presumed to be at-will employees.").

We next turn to Vision's appeal of the order certifying the Class under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. We review for abuse of discretion the certification order itself, and we review for clear error any findings of fact upon which the certification order relied. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1171-72 (9th Cir. 2010).

Vision alleges that Hester had an employment contract with Vision and that the other Class members did not. Based on

those allegations, Vision argues that Hester's claims are not typical of the Class's claims, that common issues of law and fact do not predominate, and that Hester cannot adequately represent the Class.

**[10]** Vision's argument fails, however, because Vision did not produce any evidence that Hester had an employment contract with Vision. In support of its argument that an employment contract existed, Vision refers only to a single-page, unilateral memorandum from Vision to Hester, which informed Hester of changes in rates at which Vision would pay captains and first officers. The substance of that memorandum took effect over a year after Hester began working for Vision, and Hester signed it only to indicate that he was "acknowledging receipt of this new policy." Nothing in this document, which simply details changes in the pay structure for Vision's pilots, suggests that Hester was a party to an employment contract with Vision or that he was situated differently from other members of the Class. Accordingly, Vision has not shown that the court relied on clearly erroneous facts, and we hold that the district court did not abuse its discretion in certifying the Class.

**[11]** Finally, we turn to the Class's cross-appeal of the district court's order dismissing the claim for punitive damages. We review that order de novo. *Knievel*, 393 F.3d at 1072. In this case, in which jurisdiction is based on diversity, Nevada law determines the availability of punitive damages:

> [I]n an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to the compensatory damages, may recover damages for the sake of example and by way of punishing the defendant.
>
> . . . .

> If punitive damages are claimed pursuant to this section, the trier of fact shall make a finding of whether such damages will be assessed. If such damages are to be assessed, a subsequent proceeding must be conducted before the same trier of fact to determine the amount of such damages to be assessed. The trier of fact shall make a finding of the amount to be assessed according to the provisions of this section.

NEV. REV. STAT. § 42.005(1), (3).

**[12]** As noted above, the Class's claims are not based on an action for breach of contract. Thus, the statute allows punitive damages. Whether punitive damages are appropriate and what amount is appropriate are questions reserved for the trier of fact, although the court has the responsibility to determine whether, as a matter of law, the plaintiff has offered sufficient evidence of oppression, fraud, or malice to support a punitive damages instruction. *Wickliffe v. Fletcher Jones of Las Vegas, Inc.*, 661 P.2d 1295, 1297 (Nev. 1983), *abrogated on other grounds by Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 253 n.39 (Nev. 2008).

In *Wickliffe*, for example, the lower court dismissed the plaintiff's punitive damages claim after the plaintiff's case in chief because it determined that, as a matter of law, there was insufficient evidence of oppression, fraud, or malice. *Id.* at 1296. The Nevada Supreme Court reversed, holding that there was sufficient evidence to support the instruction. *Id.* at 1297. The conduct in that case, which involved wrongful possession of a leased vehicle, "could properly have been found to be wrongful conduct that was willful, intentional, and done in reckless disregard of its possible results." *Id.* (internal quotation marks and alteration omitted).

**[13]** Likewise, in this case, the Complaint alleges facts that could allow a jury to conclude that Vision engaged in oppression, fraud, or malice when it refused to pay its employees the

hazard pay they were due, when it fired those employees to whom it had already paid hazard pay, or when it continued to accept hazard pay monies from upstream contractors for years with no intention of distributing that money. Accordingly, we reverse the order dismissing the claim for punitive damages, and we remand for a jury trial to determine whether, by clear and convincing evidence, Vision was "guilty of oppression, fraud or malice," NEV. REV. STAT. § 42.005(1), when it withheld the hazard pay from its employees.

**[14]** As a final note, based on the record before us, Harold Gewerter appears to have committed numerous ethical violations. We recommend that the district court, in the exercise of its discretion, report Mr. Gewerter to the state bar to determine whether disbarment or some other sanction is merited.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED**.

Plaintiff to recover costs.